In the

# United States Court of Appeals

### For the Seventh Circuit

---

No. 06-2915

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DAVID E. MALONE,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 CR 107—**Elaine E. Bucklo**, *Judge.*

---

ARGUED JANUARY 16, 2007—DECIDED APRIL 30, 2007

---

Before EASTERBROOK, *Chief Judge*, and POSNER and
EVANS, *Circuit Judges*.

EVANS, *Circuit Judge.* David Malone hired Russell
Axtell and others to drive band equipment long distances
across the country in rented vans. Axtell knew there was
something fishy about the arrangement: he never dealt
with any bands or drove to any concert halls; he just
picked up vans in one place and drove them to another.
Given this unusual "job," Axtell was probably not terribly
surprised when Kansas police stopped him in February
2005 during a delivery drive from Las Vegas to Malone's
apartment near Chicago and found that the six large
speakers he was transporting contained 141.5 kilograms
of 89 percent pure cocaine.

Caught red-handed, Axtell not only explained to police that he worked for Malone and provided them with extensive details about his boss's operation, he also agreed to cooperate with agents from the Drug Enforcement Agency to effectuate a controlled delivery of the cocaine to Malone. The agents fitted Axtell with a hidden recording device, and he led them to Malone's apartment building, where they waited as he parked the rental van and proceeded inside. Using his key, Axtell entered the apartment alone and found Malone asleep. He tried to rouse him, left briefly, then returned to find Malone still asleep. So Axtell left again, this time leaving the door open for the agents to enter and arrest Malone. They proceeded to do so.

Malone was read his *Miranda* rights, and he came clean about his business: he admitted that he employed drivers like Axtell to transport cocaine around the country for a group of men based in Tijuana, Mexico. Malone's drivers would pick up large quantities of cocaine in California or Nevada that had passed through Mexico and drive it to Illinois or New Jersey hidden in large speakers. Buyers in those markets would remove the drugs from the speakers and load them with cash in payment, and the drivers would then return across the country with the money, which was ultimately given to the Mexican group. Malone was paid for each leg of these deliveries.

He told the agents that Axtell was to be paid $25,000 for his efforts and noted that another driver, Les Kirschenman, was in the process of delivering a large sum of money from Illinois to Las Vegas. He then gave the agents written consent to search the apartment and two nearby garage units. Acting on this information, agents arrested Kirschenman when he arrived in Las Vegas that night. Inside the van he was driving, agents found 10 large music speakers with almost $2.5 million in cash stashed inside. A search of Malone's Chicago premises turned up empty

speakers, a drill that could be used to open them, a money counter, and certain notations relating to delivery trips. Based on other information received from Axtell, agents also arrested some of Malone's affiliates in New Jersey and seized another large shipment of cocaine.

A jury convicted Malone on a bevy of charges: conspiracy to distribute and possess with the intent to distribute more than 5 kilograms of cocaine, possessing and causing the possession of cocaine with the intent to distribute, traveling in interstate commerce to carry on a cocaine distribution conspiracy, and conspiracy to commit money laundering. He received a total sentence of 276 months. His court-appointed trial attorney subsequently withdrew from the case and new counsel was secured. Malone then filed an amended motion for a new trial, arguing that his previous attorney had provided him with ineffective assistance of counsel by failing to move for the suppression of Malone's statements and the evidence found during the search of his apartment. He now challenges the district court's decision to deny that motion. He also appeals his conviction on the money laundering count.

The elements of an ineffectiveness claim are laid out in *Strickland v. Washington*, 466 U.S. 668 (1984): Malone must demonstrate that counsel's performance was deficient—namely, "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," *Raygoza v. Hulick*, 474 F.3d 958, 962 (7th Cir. 2007)—and that counsel's deficient performance prejudiced the defense so that there is a reasonable probability that the outcome would have been different without the deficiency. "We presume that counsel is effective, and a defendant bears a heavy burden in making out a winning claim based on ineffective assistance of counsel." *United States v. Farr*, 297 F.3d 651, 658 (7th Cir. 2002).

Malone argues that his trial counsel's performance was deficient because he failed to move for suppression of the search and statements. Malone insists that the agents conducted an unauthorized warrantless arrest when they entered his apartment after Axtell left the door open and that a motion to suppress would have resulted in the suppression of evidence and his statements which followed. Without the evidence, he suggests, probably correctly, that the government's case would have been kaput.

Typically, an ineffective assistance claim raised in a motion for new trial is addressed by holding an evidentiary hearing for the trial court to consider the evidence of the trial counsel's deficiency and its possible effect on the outcome, and indeed this was the approach intended by the district court, notwithstanding the government's position that a hearing was not needed because the evidence was overwhelming enough to withstand any possible finding of performance deficiency.

Malone's new counsel, however, suggested that no hearing was necessary. She insisted that the record was already clear enough and that the absence of a warrant for Malone's arrest created a presumption of deficient representation in light of the circumstances surrounding the arrest. As a result, she said, the burden fell to the government to justify the search.

Still, the district court judge insisted that a hearing would be a good idea. But then Malone's counsel explained her plans for a hearing, which consisted of nothing more than asking the court to take judicial notice of the absence of a warrant and asking Malone and the arresting officer to confirm the date and time of his arrest. The judge asked whether she would question trial counsel about the decision not to move for suppression of the evidence, and she repeated that the absence of a warrant

was sufficient to establish the deficiency and that it was now for the government to justify the warrantless arrest. Only then did the judge determine that a hearing was unnecessary before denying the motion for new trial on the theory that, even if there was a deficiency in trial counsel's representation, it did not prejudice the outcome.

Malone's argument that deficient representation can be presumed from trial counsel's failure to file a suppression motion is without merit. A decision not to file a suppression motion can be tactical, and there are plausible reasons (a belief that such a motion has no chance for success is one) why counsel acted as he did. And those reasons cannot be deemed inappropriate on the basis of this record. Trial tactics are a matter of professional judgment, and as we first observed in *Harris v. Reed*, 894 F.2d 871, 877 (7th Cir. 1990), and continued to acknowledge in several cases since, we will not play "Monday morning quarterback"[1] when reviewing claims that an attorney rendered constitutionally deficient representation in making decisions on how best to handle a case.

When this was made clear to Malone's new counsel at oral argument, she asked for a remand to the trial court to have the evidentiary hearing. The request, without asking that the claim be dismissed, came too late. Malone had the opportunity for a hearing in the district court—the

---

[1] Of course, "Monday morning quarterback" is now passé since the advent of "Tuesday Morning Quarterback," the terrific column regularly posted by Gregg Easterbrook on ESPN.com. *See NLRB v. Cook County*, 283 F.3d 888, 895 n.5 (7th Cir. 2002). In light of the column and the marquee "Monday Night Football" NFL games from September through December each year, we think the term "Monday morning quarterback," from now on, should go the way of the drop-kick, the "T" formation, the Statue of Liberty play, and offensive tackles who weigh less than 300 pounds. From now on, a second-guesser should be called a "Tuesday Morning Quarterback."

judge (the Honorable Elaine E. Bucklo) in fact was ready to hear testimony and receive evidence before she was effectively talked out of it by Malone's argument that no suppression motion by itself established a claim of ineffective assistance of counsel. There is no second bite at the apple. We must rely on the record as it stands, and in doing so we can only conclude that Malone comes up far short of proving that counsel's decision not to file a suppression motion was ineffective. (Besides, there is absolutely nothing we can see here that would have compelled the court to grant a motion to suppress even if one had been filed.)

Malone next attacks the sufficiency of the evidence supporting his money laundering conviction, something we review under a highly deferential standard to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt . . . [and] reverse only when the record contains no evidence . . . from which a jury could find guilt beyond a reasonable doubt." *United States v. Turner*, 400 F.3d 491, 496 (7th Cir. 2005).

The government charged Malone under 18 U.S.C. § 1956(h) with conspiracy to launder money, which requires establishing that he was knowingly involved with two or more people for the purpose of money laundering, *United States v. Gracia*, 272 F.3d 866, 873 (7th Cir. 2001), and that he "1) conducted a financial transaction with the proceeds of an illegal activity; 2) knew that the property represented illegal proceeds; and 3) conducted the transaction with the intent to promote the carrying on of the unlawful activity." *United States v. Febus*, 218 F.3d 784, 789 (7th Cir. 2000); *see also* 18 U.S.C. § 1956(a)(1)(A)(i). As defined in the statute:

> [T]he term "transaction" includes a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition . . . ;

> [T]he term "financial transaction" means (A) a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments . . . [.]

18 U.S.C. § 1956(c)(3) & (4).

The cross-country transport of cash to pay for cocaine purchases (like the effort uncovered by the search of Kirschenman's van) certainly constitutes, as a "delivery" "affect[ing] interstate commerce," the kind of financial transaction covered by § 1956. But this does not resolve whether these transactions (1) involved unlawful "proceeds" and (2) were conducted with the intent to promote the carrying on of the unlawful activity.

Malone points out that the cash deliveries merely completed the sale of drugs and were not part of actions separate from the substantive criminal drug offenses for which he is already convicted. In other words, although Malone was technically engaged in a financial transaction because his drivers were transporting cash, the deliveries were made only because they served as the final step in Malone's services for the Mexico-based drug operation. He served as the conduit for the Mexican drug organization's sales in the Midwest and on the east coast, and the money being transported was never his. Rather, he was separately paid for each individual delivery.

We have previously held that the promotion element can be met by "transactions that promote the continued prosperity of the underlying offense," i.e., that at least some activities that are part and parcel of the underlying offense can be considered to promote the carrying on of the unlawful activity. *Febus*, 218 F.3d at 790. But whether these activities can be considered transactions in the proceeds of the unlawful activity is a separate question. In *United States v. Scialabba*, 282 F.3d 475, 476-

78 (7th Cir. 2002), we recognized the absence of any clear definition of "proceeds" in the money laundering statute in holding that defendants who operated illegal video poker machines in taverns and other establishments were not guilty of money laundering for making winner payouts and compensatory payments to the tavern owners who helped facilitate the operation. We explained that, unlike the act of reinvesting a criminal operation's net income to promote the carrying on of the operation, the act of paying a criminal operation's expenses out of gross income is not punishable as a transaction in proceeds under § 1956(a)(1)(A)(i). *Id.* at 476; *see also Santos v. United States*, 461 F.3d 886, 893 (7th Cir. 2006) (declining to overrule *Scialabba* in the face of conflicting holdings in other circuits). In doing so, we relied on the rule of lenity (which instructs that statutory ambiguities should be resolved in favor of the defendant) and a desire to avoid convicting a defendant of multiple crimes "when the transactions that violate one statute necessarily violate another." 282 F.3d at 477.

We believe that the *Scialabba* rule applies to Malone's case. Even though his role in the larger drug conspiracy was as a middle man, Malone was in a sense paying the expenses of his own cocaine delivery operation by exchanging funds for the product he was required to ship in order to get paid for his efforts. From Malone's standpoint, the transported cash constituted gross income for the operation that served only to pay for the product at the core of his delivery business—his only net income was the delivery fees he was paid for each drive. Malone's money laundering conviction can therefore only stand under the *Scialabba* definition of proceeds if he were charged on the basis of evidence that he conducted or attempted to conduct a financial transaction in these delivery fees. But there is no such evidence.

Accordingly, the judgment entered on Malone's conviction for conspiracy to commit money laundering is VACATED and the case is REMANDED for resentencing. The district court, however, can skip resentencing if it determines that the overall sentence imposed would be the same without the money laundering conviction. In all other respects, the judgment of the district court is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*