In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 06-3458 & 06-3502

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

PUN I. HODGE and DAVID L. KUBLY,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Western Division.
No. 05 CR 50009—**Philip G. Reinhard**, *Judge.*

ARGUED NOVEMBER 2, 2007—DECIDED MARCH 11, 2009

Before EASTERBROOK, *Chief Judge*, and POSNER and RIPPLE, *Circuit Judges*.

EASTERBROOK, *Chief Judge.* From 2001 through the end of February 2005, Pun I. Hodge and David L. Kubly operated the Fuji Health Spa, later renamed the Royal Health Spa, in Rockford, Illinois. The business's structure changed occasionally: for some of the time Hodge and Kubly rented the premises to others, who actually ran the business (though Hodge and Kubly often assisted); by

fall 2004 the tenants had departed, leaving Hodge and Kubly as owner-operators. But names and organizational details don't matter. What does matter is that "spa" was a euphemism for brothel. Some customers paid by credit card, processed by Hodge and Kubly through interstate wires. Hodge pleaded guilty to one count of conspiring to operate a racketeering enterprise through interstate facilities, 18 U.S.C. §§ 371, 1952(a)(3), and a second count of conspiracy to commit money laundering, §1956(a)(1)(A) and (h). She was sentenced to 27 months' imprisonment. Kubly, her husband, pleaded not guilty of the same charges and was convicted after a trial. He was sentenced to 36 months. Both defendants were ordered to forfeit about $270,000 in criminal receipts.

Kubly contends that the district judge should not have allowed the jury to learn that he patronized a similar establishment before buying the Royal Health Spa. He calls the evidence "prior bad acts" that should have been excluded under Fed. R. Evid. 404(b). But at trial Kubly denied knowing that prostitution occurred in the closed rooms where "masseuses" met their customers. His own experience, which showed knowledge (allowing use under Rule 404(b)'s language), undercut that defense. Both Kubly's "spa" and the one he had visited earlier charged customers a fee, nominally covering a shower and massage. Once alone with the "masseuse," the client could contract for sexual services. These were paid for in cash or on a second credit-card charge. Kubly processed hundreds of these second charges but could not explain what they were for, if not sexual services. The district judge did not err.

No more need be said about Kubly's conviction for using interstate facilities to conduct a racketeering enterprise. Money laundering is a different matter. The evidence did not show what Kubly did with the business's net revenues. The prosecutor's theory is that Kubly violated §1956 simply by paying business expenses: rent, advertising, utilities, and so on. The prosecutor recognizes that in *United States v. Scialabba*, 282 F.3d 475 (7th Cir. 2002), and *Santos v. United States*, 461 F.3d 886 (7th Cir. 2006), affirmed, 128 S. Ct. 2020 (2008), we held that the word "proceeds" in §1956 means an illegal business's net income rather than its gross income—in other words, that "proceeds" are profits, not receipts. But the United States maintains that what remained after the prostitutes received their cut was the business's net profits, which could not be spent on anything without violating §1956.

That's a preposterous understanding of net receipts. To determine the net proceeds of a transaction, which is to say the profits, one must subtract *all* costs of doing business, not just an arbitrary subset of the costs. True, the only costs at issue in *Scialabba* and *Santos*, which concerned unlicensed gambling, were the gamblers' winnings; we held that by paying the gamblers the defendants did not engage in financial transactions with proceeds. That does not imply, however, that only an illegal business's largest (or first) expense is outside the statutory scope of "proceeds." Size matters not, Yoda tells us. Nor does time. Whether Kubly paid the rent before or after paying the prostitutes has nothing to do with the distinction between gross and net. And the prosecutor is wrong to suppose that the prostitutes got

the first cut of customers' money. Rent usually is paid in advance of occupancy; advertising certainly precedes the customers it generates. Only the utility bills can be paid after the transactions to which they pertain.

*Scialabba* holds that paying the ordinary and necessary expenses of a business is not a federal crime, just because that business violates state laws. That principle covers this case (at least it covers the proof at trial, for the prosecutor did not show what Kubly did with whatever remained after expenses).

The prosecutor argues that advertising expenses must be treated differently, because §1956(a)(1)(A)(i) forbids using proceeds of crime to "promote" the carrying on of unlawful activities, but this begs the question whether Kubly used "proceeds" to pay for the advertising. If the cost of advertising, like the rent (and the prostitutes' wages) is subtracted from gross to produce net proceeds, then the answer is no.

*Should* advertising be treated differently? Not under *Scialabba*'s net-revenue approach. *Scialabba* held that expenses are subtracted to define net income. (This approach, which covers voluntary transactions such as gambling, is equally applicable to prostitution.) Consider the situation in those counties of Nevada that make licensed prostitution lawful. A brothel incurs advertising expenses, which are subtracted from gross income to create net, taxable income. No accountant would define the business's net revenue to include money used for advertising. What is paid to third parties for an input into production is not part of net income.

Indeed, any income statement that failed to subtract advertising expenses before reporting net income would be treated as fraudulent under corporate and securities law. Thus it is with lawful as well as unlawful businesses. Ford Motor Company, Apple Inc., and every other enterprise treats advertising as an ordinary and necessary business expense, which may (indeed must) be subtracted to produce the "net income" figure reported to investors, and on which taxes are paid. If Ford should violate some federal statute—if, say, repeated violations of the Clean Air Act were to end in a criminal conviction of Ford Motor Co.—this would not make it less appropriate to deduct advertising expenses before calculating net income.

Economists (unlike accountants and tax lawyers) treat advertising as an investment designed to produce future income. From an economic perspective, advertising should be capitalized and depreciated. Does this make a difference under *Scialabba*? The answer depends on how other capital outlays are classified. Accountants, tax collectors, and economists alike would treat the video-poker machines that the defendants in *Scialabba* used in their gambling business as capital investments. But no one would doubt that the cost of these tools of the trade should be netted out of "proceeds" under *Scialabba*'s approach. Likewise the cost of a business's premises, which can be obtained either by ownership (a capital expenditure) or rental. If monthly rent is netted out to produce "proceeds," the capital expense of ownership (or, equivalently, monthly depreciation on the building) also must be netted out; capital and recurring expenses are fundamentally the same for this purpose.

There is no warrant in *Scialabba* for treating capital outlays differently from recurring expenses of the Royal Health Spa. The real question is whether *Scialabba* survived the Supreme Court's decision in *Santos*.

Four Justices in *Santos* concluded that "proceeds" in §1956 always means net income. Four concluded that the word always means gross income. Justice Stevens concluded that the meaning depends on the nature of the crime—that it means net income for unlicensed gambling (the subject of *Santos* and *Scialabba*) but could mean gross income for drug rings. We asked the parties to file supplemental briefs addressing the question how *Santos* applies to a brothel (operated in a place where prostitution is unlawful) that lets the patrons pay by credit card. The United States has conceded that the net-income approach of *Scialabba* remains controlling.

Whether the concession was appropriate is a difficult question, which we need not answer since the prosecutor has forfeited any benefit that Justice Stevens's approach may offer. Justice Stevens concluded not only that normal business expenses are not proceeds but also that the money-laundering statutes should be construed to avoid raising the maximum punishment for a substantive offense that necessarily entails the use of gross revenues to carry on the business:

> [T]he penalties for money laundering are substantially more severe than those for the underlying offense of operating a gambling business. A money laundering conviction increases the statutory maximum from 5 to 20 years, and the Sentencing

Commission has prescribed different Guidelines ranges for the two crimes. When a defendant has a significant criminal history or Guidelines enhancements apply, the statutory cap of five years . . . is an important limitation on a defendant's sentence—a limitation that would be eviscerated if [a gross-receipts] definition of "proceeds" were applied in this case.

. . .

The revenue generated by a gambling business that is used to pay the essential expenses of operating that business is not "proceeds" within the meaning of the money laundering statute. As the plurality notes, there is "no explanation for why Congress would have wanted a transaction that is a normal part of a crime it had duly considered and appropriately punished elsewhere in the Criminal Code, to radically increase the sentence for that crime." [128 S. Ct. at 2027.] This conclusion dovetails with what common sense and the rule of lenity would require.

128 S. Ct. at 2033 (Stevens, J., concurring). All of this is equally true of a brothel's rent and utilities. It is not necessarily true of a brothel's advertising.

Justice Stevens was worried about duplication of legal prohibitions—about a situation in which it is impossible to commit the substantive offense without committing money laundering, unless the defendant eats or burns the currency he takes in. But §1956(a)(1)(A)(i), which forbids the "promotion" of certain unlawful enterprises,

does not create the same problem of duplication. It is possible to carry on organized crime without advertising it. Moreover, unless the costs of advertising are included in the "proceeds" subject to §1956(a)(1)(A)(i), that statute will never apply. Courts hesitate to read statutes in ways that make them pointless, so Justice Stevens may well conclude that at least for the purpose of §1956(a)(1)(A)(i) advertising costs are not subtracted when defining "proceeds." Combined with the four Justices who adopted the gross-revenue definition of "proceeds" in *Santos*, that would produce a majority for a conviction under §1956(a)(1)(A)(i) of someone in Kubly's position.

But not, however, a conviction of Kubly himself. First, the prosecutor has conceded that, for the purpose of this appeal, *Scialabba* rather than *Santos* controls. Such a concession cannot bind the court to one legal rule rather than another, but it can forfeit the benefit of a particular rule for one case. Second, the jury instructions at Kubly's trial did not distinguish between advertising and other expenses. The jury was told that it could convict if it concluded that Kubly spent money on advertising, or rent, or utilities, or almost anything else, in order to carry on the business. As a matter of law, a brothel's expenditures on rent and utilities do not come from net proceeds and so do not violate §1956(a)(1), which means that a general verdict cannot stand. Compare *Yates v. United States*, 354 U.S. 298 (1957), with *Griffin v. United States*, 502 U.S. 46 (1991).

Kubly must be resentenced in light of this conclusion, but Hodge's convictions are based on her guilty plea, so

we must address her arguments about the sentence. By pleading guilty to money laundering as well as racketeering, Hodge bargained away the opportunity to make the sort of argument on which Kubly has just prevailed. She did this with eyes open, for her guilty plea came more than three years after *Scialabba*. In exchange for giving up the right to force the prosecutor to show that the business laundered its profits, Hodge received a reduction for acceptance of responsibility. (That's why her sentence is lower than Kubly's.) For all we know the prosecutor could have shown that Hodge and Kubly *did* engage in prohibited financial transactions with the profits of their illegal business. The prosecutor tried to prove that offense against Kubly the easy way (every business must cover its expenses) rather than by showing how the business used its profits. One can't rule out the possibility that the prosecutor could have established a prohibited use of the profits. Laundering the proceeds of organized crime is indeed illegal. Because the indictment against Hodge could not be dismissed for failure to state an offense, she is bound by her plea.

One of Hodge's arguments is that the forfeiture is excessive because it represents the intake of the business (at least, the portion paid by credit card) without subtracting revenues from the lawful shower-and-massage service. When a business has both lawful and unlawful aspects, only the income attributable to the unlawful activities is forfeitable.

That is because the forfeiture statute covers only income and assets obtained from the unlawful deeds. 18 U.S.C.

§981(a)(2)(A). The problem for Hodge is that most customers came to the Royal Health Spa (a shabby storefront despite its lofty name) for sex. If every customer paid for sex, then the initial charge was just an admission fee. A brothel that collected $50 at the door, plus fees for specific sexual acts, could not avoid forfeiture of the $50 cover charge. The initial fee at the Royal Health Spa may be just such a cover charge. To put this otherwise, if the only reason why anyone paid for a massage at the Royal Health Spa was to purchase sexual services, then all of the business's income derives from prostitution and is forfeitable. *United States v. Baker*, 227 F.3d 955 (7th Cir. 2000). The statute says that derivation may be direct or indirect. It is apt to treat an entrance fee as an indirect part of the compensation for the illegal acts.

According to evidence at Kubly's trial, however, somewhere between 20% and 50% of the spa's customers never signed a second credit slip. This could mean that a substantial fraction of the spa's business was the provision of lawful massages. Or it could mean that these customers paid the prostitutes in cash. The district judge did not attempt to sort this out. As we see things, the difference matters. If the spa did a substantial lawful business, then the revenues of the lawful activity are not forfeitable. If the lack of a second credit slip means only that the clients paid in cash, however, and the business as a whole was overwhelmingly devoted to prostitution, then everything is forfeitable. The subject requires more attention on remand. If the business as a whole would have closed its doors but for the prostitution component, then it makes sense to say that all of its

revenues derive (if indirectly) from prostitution; but if it could have operated as a legitimate massage parlor, then the revenues of the legal part of the business are not forfeitable.

Hodge contests her prison sentence as well as the forfeiture. When calculating the guideline range, the district court started with U.S.S.G. §2S1.1, which deals with money laundering. Guideline 2S1.1(a)(1) says that the base offense level comes from "[t]he offense level for the underlying offense from which the laundered funds were derived" when that level is ascertainable. That sent the district court to U.S.S.G. §2G1.1, which deals with commercial prostitution. That guideline provides a base level of 14. The district judge then returned to §2S1.1(b)(2)(B) and added two levels because Hodge had been convicted under §1956. She contends that this addition is inappropriate because U.S.S.G. §1B1.5(b)(1) says:

> An instruction to use the offense level from another offense guideline refers to the offense level from the entire offense guideline (i.e., the base offense level, specific offense characteristics, cross references, and special instructions), except as provided in subdivision (2) below.

Subdivision (2) adds that an instruction "to use a particular subsection or table from another offense guideline refers only to the particular subsection or table references, and not to the entire offense guideline." Guideline §2S1.1(a)(1) sends the court to the base offense level of the substantive offense, not to a particular table or sub-

section. It follows, Hodge maintains, that §2G1.1 covers additions as well as the base level, and as that section does not provide an enhancement for convictions under §1956 the offense level should have remained at 14.

The prosecutor responds: "If the specific enhancement in U.S.S.G. §2S1.1(b)(2)(B) were not to apply, then there really would be no punishment under the Guidelines for the money laundering conviction." True enough, but how does this meet the argument that §1B1.5(b)(1) prevents the court from combining the features of two guidelines? What the prosecutor wants is the use of a base level plus cumulative enhancements under *two* guidelines. That certainly would lead to higher sentences but is not a sound understanding of the Sentencing Commission's approach.

Section 2S1.1(a) was amended in 2001 to incorporate the guidelines for the underlying substantive crimes. Amendment 634, effective Nov. 1, 2001. In the prosecutor's view, this amendment is designed to use the guideline for the substantive offense only when it is greater than the guideline for money laundering; when the money-laundering guideline is higher, it should continue to apply—and ideally, as the prosecutor sees things, it should be possible to combine a higher base offense from the substantive crime with the enhancements from the money-laundering guideline, to yield the longest possible sentence.

This is not, however, what the amended language of §2S1.1(a)(1) says. The Guidelines have plenty of "use X if higher" clauses; §2S1.1(a)(1) is not among them. True

enough, one reason for the amendment was a belief that, if the substantive offense is very serious, the sentence should be higher than one based on money laundering alone. The Sentencing Commission said as much in its explanation for Amendment 634. But the Commission also explained that its goal was to reduce the effect of charging decisions and make the sentence reflect real-offense behavior.

> This amendment is designed to promote proportionality by providing increased penalties for defendants who launder funds derived from more serious underlying criminal conduct, such as drug trafficking, crimes of violence, and fraud offenses that generate relatively high loss amounts, *and decreased penalties for defendants who launder funds derived from less serious underlying criminal conduct*, such as basic fraud offenses that generate relatively low loss amounts.

Sentencing Guidelines Manual App. C (Vol. II) 222 (emphasis added). The prosecutor's suggestion that the 2001 amendment propels sentences higher, but never lower, is at odds with this explanation.

Two courts of appeals have held that the reference in §2S1.1(a)(1) means that judges should use the offense level calculated under the substantive guideline as the base level for money laundering, and then make any other adjustments that the money-laundering guideline provides. See *United States v. Anderson*, 526 F.3d 319, 327–28 (6th Cir. 2008); *United States v. Cruzado-Laureano*, 440 F.3d 44, 48 (1st Cir. 2006). Using the guideline (including its

adjustments) for one offense as the "base" level for another is an unusual approach, but it has the support of the Commission's own explanation:

> For direct money launderers (offenders who commit or would be accountable under §1B1.3(a)(1)(A) (Relevant Conduct) for the underlying offense which generated the criminal proceeds), subsection (a)(1) sets the base offense level at the offense level in Chapter Two (Offense Conduct) for the underlying offense (i.e., the base offense level, specific offense characteristics, cross references, and special instructions for the underlying offense).

Sentencing Guidelines Manual App. C (Vol. II) 222. This implies that §2S1.1(a)(1) sends district courts to the complete substantive guideline, not just its base offense level, and that the result is then plugged back into the base for money laundering. Another comment by the Commission says that things work this way:

> As a result of the enhancements provided by subsections (b)(2)(A), (b)(2)(B), and (b)(3), *all* direct money launderers will receive an offense level that is one to four levels greater than the Chapter Two offense level for the underlying offense, depending on the statute of conviction and sophistication of the money laundering offense conduct.

Sentencing Guidelines Manual App. C (Vol. II) 223 (emphasis added). Adding levels for "all" direct launderers is possible only if, as *Anderson* and *Cruzado-Laureano* hold, §2S1.1(a)(1) plugs the full offense level for the substan-

tive guideline into the "base" level for money laundering. If this is hard to reconcile with §1B1.5(b), so be it; the Commission is entitled to modify its own handiwork, and Amendment 634 was adopted long after §1B1.5(b), which was part of the original Guidelines of 1987.

The Commission's statement that "all direct launderers" receive extra levels under §2S1.1(b) speaks to Hodge's situation. That, plus our reluctance to create a conflict among the circuits, leads us to join *Anderson* and *Cruzado-Laureano* in concluding that §2S1.1(a)(1) treats substantive guidelines as providing base offense levels for the purpose of §2S1.1.

Defendants' other arguments do not require discussion; they have been considered and are rejected. Kubly's conviction under §371 and §1952(a)(3) is affirmed, but his conviction under §1956 is reversed and his case remanded for resentencing. Hodge's sentence of imprisonment is affirmed, but the forfeiture is vacated and remanded for proceedings consistent with this opinion.