In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 06-3029, 06-3040 and 06-3438

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KENNETH LEE AND MYUNG O. LEE,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Western Division.
Nos. 05 CR 50007 and 05 CR 50010—**Philip G. Reinhard**, *Judge.*

ARGUED JANUARY 9, 2008—DECIDED MARCH 11, 2009

Before WOOD, SYKES, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* This case involves two defendants, Myung Ok Lee and Kenneth Lee.[1] The Lees are unrelated and were tried in separate cases consolidated here on appeal. While separate cases, they involve similar facts and overlapping legal issues. Both

---

[1] To avoid confusion we will refer to Myung Ok Lee as "Ms. Lee" and Kenneth Lee as "Mr. Lee."

defendants were involved with "spas" which were fronts for prostitution businesses in the Rockford, Illinois area. Both were charged, in separate but similar two-count superceding indictments, with conspiracy to use interstate facilities in violation of 18 U.S.C. §§ 371 and 1952(a) as Count One and conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) as Count Two. They were convicted, following jury trials, on both Counts, and they now appeal. The Lees make a joint argument concerning "proceeds" in challenging the money laundering conspiracy convictions, and they argue that identical errors occurred in both of their sentencing calculations. Mr. Lee independently argues that there was insufficient evidence with respect to his membership in the conspiracies in both Counts, and Ms. Lee contests the admission of witness Anna Kim's allegedly "unfairly prejudicial" testimony in her trial.

## I.  Background

The spas and prostitution businesses with which the Lees were involved were all operated in the same manner. Upon arrival, customers would pay the receptionist an entrance fee for a massage. This would be recorded in the spa's "books." After making special arrangements in the individual "massage" rooms, customers could then pay an additional fee directly to a "masseuse" for sex acts. The masseuses would record these exchanges in the books but with a missing zero—thus, an additional $200 was recorded as $20. Some customers would pay these extra fees and/or the entrance fees with credit cards. The cards

were swiped through credit card machines connected to interstate telephone facilities to receive payment authorization. These funds were deposited into business checking accounts. The masseuses split the prostitution profits with the owners/operators 50/50, with the masseuses' portion usually taken out of the available cash. The funds deposited in the business accounts were used to pay for various business and promotional expenses, including utilities, rent, and advertising.

Mr. Lee was involved in two spas—the Pine Tree Spa and the Paradise Health Spa. Young Ja Hwang was in charge of both businesses, Pine Tree between June 2002 and October 2003, and Paradise between January 2004 and February 2005. Eun Sook Choi, Hwang's sister-in-law, served as a front for the business, signing the building leases and serving as the signatory on the Paradise bank account. Mr. Lee, who was romantically involved with Hwang, assisted in the operation of these massage parlors. He often translated for her and other employees who spoke Korean. He also did construction work and maintenance on the businesses' premises and was involved with obtaining licenses and massage permits for the spa. Mr. Lee would also frequently send postal money orders on behalf of the masseuses. More details of his involvement are discussed below.

Ms. Lee owned and operated the Tokyo Oriental Health Spa as a front for a prostitution business between December 2002 and February 2005. She ran the day-to-day operations including paying the bills, arranging advertising, hiring masseuses, and so forth. Ms. Lee's co-defendant,

Mia Deboer, did the cooking and cleaning and collected money from the masseuses when Ms. Lee was out of town.

In both cases the use of the credit card machines and interstate telephone facilities to promote the prostitution businesses served as the basis for the convictions under 18 U.S.C. §§ 371 and 1952. The payments out of the business checking accounts were used to establish the money laundering violations.

## II. "Proceeds"

Both Ms. Lee and Mr. Lee challenge their convictions under the money laundering statute. They argue that under the term "proceeds"—meaning "net" rather than "gross" as outlined in our circuit cases *Scialabba* and *Santos* and recently affirmed by the Supreme Court[2]—there was insufficient evidence for conspiracy to commit money laundering. In reviewing for sufficiency of the evidence, we consider the evidence in the light most favorable to the government, drawing all reasonable inferences in the government's favor. *United States v. Morris*, 498 F.3d 634, 637 (7th Cir. 2007). We will reverse only if a rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt. *United States v. Malone*, 484 F.3d 916, 920 (7th Cir. 2007).

The evidence used by the government at both trials to establish the money laundering violations focused on

---

[2] *United States v. Scialabba*, 282 F.3d 475 (7th Cir. 2002); *Santos v. United States*, 461 F.3d 886 (7th Cir. 2006), *aff'd*, *United States v. Santos*, 128 S. Ct. 2020 (2008).

expenditures made out of the business checking account for each spa. Records were also introduced from the publications in which the spas advertised. At both trials, Mr. Murray, an IRS accountant, testified regarding the checking accounts and provided a summary of the withdrawal activity. The funds in these accounts consisted, in large part, of the deposits from the credit card payments by massage parlor customers. From the summaries, it appears that a substantial portion of the funds in the business checking accounts was spent on advertising, and in Mr. Lee's case there was also evidence that Mr. Lee told FBI Agent David Childre in a recorded conversation that they spent about $18,000 a month on advertising. Other payments out of the accounts included rent, phone bills, and some wages.

The relevant language from the money laundering statute is as follows:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—(A)(i) with the intent to promote the carrying on of specified unlawful activity . . . ; or (B) knowing that the transaction is designed in whole or in part—(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . shall be sentenced . . . .

18 U.S.C. § 1956(a)(1). Here the defendants were prosecuted under subpart (a)(1)(A) for promotion, rather than

under (B) for concealment. Accordingly, to make its case, the government had to show that the defendants were in fact part of the conspiracy to launder money,[3] and that the defendants "(1) conducted a financial transaction with the proceeds of an illegal activity; (2) knew the property represented illegal proceeds; and (3) conducted the transaction with the intent to promote the carrying on of the unlawful activity." *Malone*, 484 F.3d at 920 (quoting *United States v. Febus*, 218 F.3d 784, 789 (7th Cir. 2000)).

Under the first prong, the payments out of the business checking accounts clearly meet the definition of "financial transaction." It is also clear, since the credit card prostitution fees were deposited into the accounts, that the money was from an "illegal activity." (No one contests that the "extras" offered by the masseuses amounted to illegal prostitution under Illinois law.) It is equally obvious, under the third prong, that the advertising purchases promoted the carrying on of the use of interstate telephone facilities in aid of the commission of illegal prostitution operations. "[T]he promotion element can be met by 'transactions that promote the continued prosperity of the underlying offense' . . . ." *Malone*, 484 F.3d at 921 (quoting *Febus*, 218 F.3d at 790); *see also Santos v. United States*, 461 F.3d 886, 893 (7th Cir. 2006) (explaining that reinvesting net income to promote the carrying on of the criminal operation constitutes money laundering)

---

[3] The conspiracy issue is discussed separately in the next section regarding Mr. Lee. Ms. Lee did not put forth any argument challenging the conspiracy aspect of this charge.

*aff'd*, *United States v. Santos*, 128 S. Ct. 2020 (2008). Purchasing advertising inherently promoted the prosperity of the underlying offense. The government also alleges that the "future rent" payments out of the account also amounted to money laundering. Those payments clearly satisfy the requirement that the transactions were made with the intent to promote the carrying on of the underlying illegal operation as well. *See Malone*, 484 F.3d at 921 ("[A]t least some activities that are part and parcel of the underlying offense can be considered to promote the carrying on of the unlawful activity."); *see also Febus*, 219 F.3d at 790.

The more difficult issue before us is whether the government established that the transactions involved illegal "proceeds." We spoke at great length on the meaning of the statutory term "proceeds" in *Scialabba* and *Santos*. In *Scialabba* the underlying business enterprise was an illegal coin gambling business. *Scialabba*, 282 F.3d at 475-76. Participants put coins into gaming machines and then received onscreen credits if they won. They could continue to play with these credits or redeem them at retail outlets for cash. *Id.* The acts in question, for laundering purposes, were giving some of the money in the coin boxes to the outlets' owners and spending some of the money to meet business expenses like leasing the video machines and obtaining licenses. *Id.* We found, relying on the rule of lenity, that "at least when the crime entails voluntary, business-like operations, 'proceeds' must be net income; otherwise the predicate crime merges into money laundering (for no business can be carried on without expenses) and the word 'proceeds' loses opera-

tional significance." *Id.* at 475, 477. We found that these were not "proceeds" because they did not amount to profit. The money laundering convictions were vacated.

We viewed *Santos* essentially as a head-on re-litigation of *Scialabba* and declined to overrule *Scialabba*. *Santos*, 461 F.3d at 888-89. In *Santos* the defendant operated an illegal lottery—a "bolita." Gamblers would place bets with bolita runners, who turned the money over to collectors, who, in turn, gave the money to Santos. The runners, the collectors, and the winners all were paid out of the total amount collected. *Id.* at 888. The district court vacated the convictions following *Scialabba*. On appeal we found that these transactions were "conceptually indistinguishable" from those in *Scialabba*. *Id.* at 891. We acknowledged that the First, Third, and Eighth Circuits had concluded differently. *Id.* at 891-92. We also recognized the legitimacy of the government's contention that there would be evidentiary problems in reading "proceeds" to mean net income as well as disparities in the sentences for the underlying offense and the money laundering. *Id.* at 893. But none of these concerns warranted overturning *Scialabba*. *Id.* at 893-94. We did clarify and confirm that the statute does indeed prohibit both concealment of net proceeds and the reinvestment of net proceeds to promote the illicit activity; *Scialabba* had not suggested otherwise. *Id.* at 892-93; *see also* 18 U.S.C. § 1956(a)(1)(A)(i), (B)(i).

In affirming our decision in *Santos*, the Supreme Court agreed that an illegal lottery's payments to winners and employees are not "proceeds" within the meaning of

§ 1956(a)(1). 128 S. Ct. at 2031. A plurality of four Justices also adopted *Scialabba*'s definition of proceeds as a business' net "profits," rather than its gross "receipts." *Id.* at 2025 (plurality opinion). However, in his controlling concurrence, Justice Stevens declined to "pick a single definition of 'proceeds' applicable to every unlawful activity." *Id.* at 2032 (Stevens, J., concurring). For Justice Stevens, the meaning of "proceeds" should turn on whether legislative history indicates that Congress intended to reach the gross revenues of a specified crime. *Id.* at 2032.

Finally, in an opinion released today, *United States v. Hodge*, Nos. 06-3458 & 06-3052 (7th Cir. Mar. 11, 2009), we examine the application of § 1956(a)(1) to prostitution businesses similar to the spas operated by the Lees. The government in *Hodge* obtained a jury conviction of money laundering after introducing evidence of the businesses' rent, utilities, and advertising expenses. *Hodge*, slip op. at 3. We conclude that the evidence of rent and utilities is insufficient to support the conviction. These costs are essential operating expenses, which, under both *Scialabba* and *Santos*, do not count as "proceeds" within the meaning of § 1956(a)(1). *Id.* at 3-4.

We also note in *Hodge* that the question of whether the businesses' advertising expenses may qualify as proceeds is more difficult. Although ordinary advertising costs would not fall within *Scialabba*'s net-profits definition of proceeds, treating these costs as proceeds may be consistent with Justice Stevens' crime-specific interpretation of § 1956(a)(1). *Id.* at 4-6. Nonetheless, we do not decide

whether the advertising expenses in *Hodge* count as proceeds because of a problem with the jury's general verdict. The jury instructions did not distinguish between advertising and other expenses. Thus, the jury may have convicted based on evidence of the businesses' rent and utilities—expenses that, as a matter of law, do not constitute proceeds under § 1956(a)(1). *Id.* at 8. Because it is impossible to tell whether the jury relied on the legally insufficient evidence of rent and utilities or the possibly legally sufficient evidence of advertising costs, we conclude that the general verdict in *Hodge* cannot stand. *Id.* (citing *Yates v. United States*, 354 U.S. 298 (1957)).

With this backdrop, the issue now before the court in the instant case is whether there was sufficient evidence of financial transactions involving proceeds upon which to convict the Lees. In these massage parlor operations, the masseuses' take of the prostitution money was paid to them primarily out of the spas' cash. The cash was also used to buy "supplies." The credit card income and some cash were deposited in the businesses' accounts. Various bills were paid out of the accounts. These payments appear to include bills, some wages, rent, and advertising expenses, according to the checking account summaries submitted by the government.

As in *Hodge*, we find that the evidence in these two cases of the spas' rent, utilities, and wages is insufficient to support a conviction of money laundering. Because these costs are regular expenses that are essential to the spas' operation, they are not "proceeds" within the meaning of § 1956(a)(1).

The government argues that the evidence showed that future rent payments came out of net rather than gross proceeds because they represented reinvestment transactions, rather than past operational expenses. Under this view, net proceeds include all of the revenues left after the spas paid the prostitutes' salaries and bills for past expenses.

This temporal approach for distinguishing between net and gross proceeds is inconsistent with *Scialabba*'s and *Santos*' focus on net profits. An ordinary and necessary business expense does not come out of net profits merely because it relates to a future event. And paying rent for a physical location to house a business is rightly considered an ordinary and necessary expense. It is not logical or persuasive to say, as the government asserts, that simply because rent is paid for the upcoming month, before use, and utilities are paid at the end of the month, for the amount used, that one is paid for with gross income and one paid for with net. The issue is whether the payments were reinvestment of net proceeds to promote the carrying on of the operation or the act of paying the operation's expenses out of gross income.

We also note that this is not an instance where rent was paid months in advance as some sort of capital investment, or where an operation expanded and rented new space, or even where a business had a month-to-month tenancy with each month the decision being made anew whether to invest their profits into another month of business or to cash out (all cases in which, at least arguably, rent might be properly considered paid

out of net income). Rather, the government's account summaries simply show regular, approximately monthly, payments. This is how rent is typically paid under a lease, each month in advance.

Although the spas' rent clearly does not qualify as "proceeds," the question of whether the spas' advertising expenses qualify is more difficult in light of the Supreme Court's decision in *Santos*. As we explain in *Hodge*, treating the advertising costs of certain illegal operations as "proceeds" may be consistent with Justice Stevens' crime-specific interpretation of § 1956(a)(1). *Hodge*, slip op. at 6-8. And even under the *Santos* plurality's net-profits definition of proceeds, there may be some situations where advertising could be paid for out of "net" income. For example, if a business decides to expand into a new market—that initial expenditure on new advertising might be a "reinvestment of net proceeds." *Cf. Santos*, 128 S. Ct. at 2029 n.7 ("[I]t will be up to the Government to select that period of time for which it can most readily establish the necessary elements of the charged offenses, including (if money laundering is one of them) profitability."); *id.* at 2029 ("[T]he Government will have to prove the profitability of just three offenses, selecting (again) those for which profitability is clearest. And of course a prosecutor will often be able to charge the underlying crimes instead of the overarching enter-prise crime.").

In the Lees' cases, however, it is unnecessary to decide whether the spas' advertising expenses may qualify as proceeds because, as in *Hodge*, we encounter a problem

with the juries' general verdicts. The jury instructions in these cases did not distinguish between advertising expenses and other regular business expenses. It is impossible to tell whether the juries based their verdicts on the legally insufficient ground that rent and utilities are net proceeds, or the possibly legally sufficient ground that advertising costs are net proceeds. Thus, the juries' general verdicts cannot stand. *See Yates v. United States*, 354 U.S. 298, 311-12 (1957).

The government points out that the jury instructions in the Lees' cases correctly defined "proceeds" as "net rather than gross proceeds." While that is a notable distinction from the instructions in *Hodge*, *see Hodge*, slip op. at 8, the instructions were not specific enough to tell the juries that ordinary rent and utilities do not count as net proceeds. So if the government's theory at trial was that evidence of rent and utilities could support a conviction of money laundering, the instructions do not permit us to assume that the juries did not rely on that theory to convict the Lees. *Cf. United States v. Van Allen*, 524 F.3d 815, 824 (7th Cir. 2008) (rejecting the argument that a conviction for concealment of assets was based on a legally insufficient theory, where the government did not argue that theory to the jury); *United States v. Watson*, 525 F.3d 583, 590 (7th Cir. 2008) (concluding that a line in the government's indictment that contained a legally insufficient theory of jurisdiction did not invalidate a Hobbs Act conviction, where the government "never even mentioned" that theory to the jury).

The prosecution in these cases introduced evidence of the spas' advertising expenses alongside evidence of

rent and utilities, and no argument that advertising in particular was paid for out of net rather than gross income was ever presented to the juries. (In fact the account summaries submitted by the government in both cases included utility payments—which the government now concedes on appeal were payments out of gross income—right along with rent payments and advertising payments. At no point did the prosecution argue which of these items were paid for with net or which with gross.) On these facts, the government's theory of its money laundering case was that all of the spas' business expenses could be "proceeds" within the meaning of § 1956(a)(1). And the jury instructions, while correctly referring to "net proceeds," were not specific enough to tell the juries which of the government's evidence they could rely on. Because the juries may have based their general verdicts on the legally insufficient theory that rents and utilities count as proceeds, *Yates* requires that these verdicts be set aside.

### III. Mr. Lee's Conspiracy Challenges

Mr. Lee makes two other sufficiency-of-the-evidence arguments. Here, too, in reviewing for sufficiency of the evidence, we consider the evidence in the light most favorable to the government, drawing all reasonable inferences in the government's favor, *Morris*, 498 F.3d at 637, reversing only if a rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt, *Malone*, 484 F.3d at 920. Mr. Lee argues that there was insufficient evidence to convict

him of the money laundering conspiracy at all (regardless and apart from the net versus gross argument, discussed above), and that there was insufficient evidence to convict him of the conspiracy to use interstate facilities. Basic to both claims, he argues the evidence was insufficient to establish that he knowingly joined the conspiracies in question. We need not consider his argument with respect to the money laundering claim, due to our discussion *supra* in which we determined that conviction could not stand. We disagree, however, with Mr. Lee's argument with respect to the conspiracy to use interstate facilities, finding ample evidence on which a jury could conclude he knowingly joined and participated in the charged conspiracies.

In order to prove Mr. Lee guilty of conspiracy, the government had to show (1) that the conspiracy charged in the superceding indictment existed; (2) that Mr. Lee knowingly became a member of the conspiracy with an intention to further the conspiracy; and (3) that an overt act was committed by at least one conspirator in furtherance of the conspiracy. *E.g., United States v. Hickok*, 77 F.3d 992, 1004-05 (7th Cir. 1996). Mr. Lee disputes the second element. He argues that he was merely a handyman and a translator and that he did not agree to use interstate facilities. To the contrary, however, the government showed that Mr. Lee was intimately involved in the entire massage parlor enterprise.

Mr. Lee was frequently at the spas and contributed in many ways. There was testimony at trial that he did construction and remodeling for the spas. Mr. Lee dealt

with the Rockford City Zoning Division on zoning and licensing issues for the spas. He helped the masseuses by sending postal money orders for them, usually charging 1%. He would pick the masseuses up at the airport. Co-defendant Mi Ran Park testified that Mr. Lee helped her learn to use the credit card machine and placed news-paper ads when Park later began managing the spa under a different owner. His number was also posted next to the phones/credit card machine along with Hwang's, from which it could be inferred that he was someone the employees could call for assistance or to report problems. A detective recovered $77,000 in cash, some Mr. Lee's and some Hwang's, from a safe deposit box in Mr. Lee's name; Mr. Lee told FBI Agent Randall Sealby these funds derived from the Pine Tree Spa. During meetings with undercover FBI Agent David Childre, Mr. Lee described the business in detail, fre-quently using the term "we" and specifically explaining that they do a lot of credit card business and that they spend close to $18,000 a month on advertising. Mr. Lee also participated by translating for Hwang and other employees and attended meetings with Hwang.

This was enough for a jury to reasonably conclude he joined the interstate facilities conspiracy with full knowl-edge and intent that the prostitution business would be advanced with the usage of the credit card machine. Importantly, the government did not have to prove that Mr. Lee himself used the credit card machine. It is well established that circumstantial evidence is sufficient to establish membership in the conspiracy. *See, e.g., United States v. Miller*, 405 F.3d 551, 555 (7th Cir. 2005) ("The

government may establish these elements through 'circumstantial evidence and the reasonable inferences therein concerning the parties' relationships, their overt acts, and their overall conduct.'" (quoting *United States v. Navarrete*, 125 F.3d 559, 562 (7th Cir. 1997))). One could easily infer based on his statements and evidence of his extensive involvement that Mr. Lee knowingly agreed to and furthered the conspiracy to use the credit card machines in carrying on the prostitution business. Particularly, his statements alone about using credit cards and the testimony about him teaching someone to use the machine were sufficient evidence from which the jury could infer he knowingly became a member of that conspiracy.

Given the defendant's very heavy burden here on appeal and the amount of evidence showing that he was involved in the entire massage parlor business, he simply cannot prevail on this argument.

### IV. Admissibility of Rule 404(b) Evidence as to Ms. Lee

Ms. Lee challenges certain evidence admitted under Federal Rule of Evidence 404(b). At Ms. Lee's trial, the government called Insika "Anna" Kim to testify. Anna Kim had been a "masseuse" at the Tokyo Spa in Rockford and at the Rainbow Spa that Ms. Lee purportedly operated in Toledo, Ohio, from 1999-2000. Ms. Lee filed a pretrial motion in limine to keep out Kim's testimony regarding the Rainbow Spa. Ms. Lee's objection was to

the pattern/propensity nature of the testimony, arguing that it was prejudicial when Ms. Lee was charged only in connection with the Tokyo Spa in Rockford. The government asserted that the evidence was admissible under Rule 404(b). Ms. Lee's defense was going to include an argument that she was unaware of the prostitution at the Tokyo Spa. Therefore, the government argued to the district judge, Ms. Lee's prior experience became relevant and Kim's testimony should be admitted for that limited purpose of demonstrating knowledge. The district judge decided that the evidence would be admissible under Rule 404(b) with a limiting instruction.

Ms. Lee did make such a defense as early as opening statements, and Kim did testify. The judge gave the jury a limiting instruction, tracking the familiar Seventh Circuit pattern criminal instruction 3.04, both at the time of the testimony and again following closing statements. Kim testified about the operations of both the Toledo and Rockford spas, explaining the bookkeeping system at both spas, how condoms were obtained and disposed of at the Rockford spa, and so forth. Kim's testimony, both on direct and cross-examination, also included references to "forced sex." She mentioned during her direct examination that she was pushed into a room on her first day at the Rainbow Spa in Toledo to observe and then on subsequent days to perform sexual acts. On cross-examination, she elaborated further, even stating she was put in metal chains.

Ms. Lee now argues on appeal that Kim's "forced sex" testimony should have been excluded pursuant to Rules

403 and 404(b), and that given the "shocking and devastating" nature of the testimony, the limiting instruction was not enough to counter the prejudice. The district court admitted Kim's Rainbow Spa testimony under Rule 404(b). We review for abuse of discretion. *United States v. Ross*, 510 F.3d 702, 713 (7th Cir. 2007). Admissibility under Federal Rule of Evidence 404(b) is governed by a four-part test: Whether,

> (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged;

> (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue;

> (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; and

> (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*Id.*; *United States v. Zapata*, 871 F.2d 616, 620-21 (7th Cir. 1989). Under all four prongs, the district judge's conclusion to admit Kim's Rainbow Spa testimony in general was correct. The evidence went directly to Ms. Lee's knowledge—an issue other than the defendant's propensity to commit the crime charged. Ms. Lee herself made knowledge an issue by arguing she was unaware of the prostitution. Thus, under the first prong, Kim's testimony was properly admitted to prove knowledge and

lack of mistake or accident. The second prong was also
met; the Toledo spa operation was practically identical
in operation to the Rockford spa at issue in the present
case. The time frame was within two years, close enough
to be relevant to the matter in issue. *See, e.g.*, *United States
v. Best*, 250 F.3d 1084, 1092 (7th Cir. 2001) (finding a
prior identical cocaine offense two years earlier was
sufficiently similar); *United States v. Tringali*, 71 F.3d
1375, 1379 (7th Cir. 1995) (concluding evidence within
ten years was admissible to show present knowledge).
Kim's first-hand testimony was sufficient to satisfy prong
three, and Ms. Lee did not argue otherwise. The fourth
prong is the most contentious.

Ms. Lee argues that Kim's testimony was overly prejudi-
cial. The district court judge concluded that it was not. He
acknowledged that some people may not like that kind of
operation, but that the probative value was not substan-
tially outweighed by the danger of unfair prejudice. We
agree with that determination. Admitting testimony
regarding Ms. Lee's business at the Rainbow Spa did not
present unfair prejudice—it was essentially the very
same behavior she was charged with in connection
with the Rockford spa operation. Eliciting testimony
about her previous experience in an identical operation
to show her knowledge is not such that its probative
value would be *substantially outweighed* by the danger of
*unfair* prejudice. Therefore, as to Kim's testimony about
the Rainbow Spa generally, the district court's Rule 404(b)
determination was correct.

In her brief, Ms. Lee focuses on the prejudice of the
"forced sex" testimony in particular. The fourth prong

of the Rule 404(b) test excludes evidence only when the danger of unfair prejudice substantially outweighs the probative value. The fact that Kim said she was pushed into a room to watch and/or engage in sexual acts in the Rainbow Spa is probative, establishing Ms. Lee's knowledge of the spa prostitution, as we already discussed. Arguably the forced aspect of it is more prejudicial than prostitution generally as it could be construed as rape. Furthermore, that specific testimony added little new probative evidence, since Kim's other testimony regarding the Rainbow Spa had already established Ms. Lee's knowledge. However, given the circumstances, which we discuss further in the following paragraphs, there was simply no true "danger of unfair prejudice" that would induce the jury to decide the case on some improper basis. Admitting the testimony was not plain error.[4] Morever, even if we were to conclude that the

---

[4] It appears that Ms. Lee really did not preserve her objection to the "forced sex" testimony. As admitted at oral argument, no objection was raised during trial when the forced-sex testimony came out. Ms. Lee argues that the issue was preserved via her pretrial motion in limine to preclude Kim's Rainbow Spa testimony altogether. This, however, was insufficient because with that objection came no indication that there would be any testimony about forced sex—Ms. Lee simply objected to the pattern/propensity aspect of the testimony. *See United States v. Swan*, 486 F.3d 260, 264 (7th Cir. 2007); *Wilson v. Williams*, 182 F.3d 562 (7th Cir. 1999); Fed. R. of Evid. 103 (requiring a party to state a "specific ground" of the objection). The ramifications of failing to preserve the issue for appeal is to downgrade

(continued...)

forced-sex aspect of the testimony was admitted in error under Rule 404(b), that admission, at its worst, would most certainly be harmless, for the following reasons.

First, the majority of the forced-sex details came out during cross-examination (notably not by the government during direct) in an attempt by the defense to discredit Kim. And this attempt to discredit was rather successful in providing plenty for the defense to argue to the jury about Kim's credibility.[5] Given the unusual

---

[4] (...continued)
the standard of review from abuse of discretion to plain error. *United States v. Blount*, 502 F.3d 674, 677-78 (7th Cir. 2007). Discussing this in more detail, however, is not worthwhile. Ms. Lee's claim here is not meritorious, for the reasons explained *infra*, regardless of what standard applies.

[5] Kim's testimony during cross was rather unusual at times as she discussed her life and employment history. In addition to elaborating on her "forced sex" testimony, she testified that she had worked previously as a partner in a Tampa restaurant business; was owner of a major medical health insurance business in Houston; became a partner on a shrimp boat in Biloxi; owned an apartment building; worked as a dental technician, walking some 35 miles each way to and from work daily; and became a contractor by reading a library book, to name only a few of her accomplishments. Kim also testified that she tried to sell one of her kidneys for $26,000 at a market in Houston. She described how she came to work at the Toledo spa, explaining that a woman in a Mississippi hair salon gave her a phone number. After calling that number, she took a bus to Flint, Michigan. Apparently she was not their
(continued...)

nature of her testimony, any prejudicial impact or imper-
missible emotional pull of the forced-sex allegations
seems negligible. After hearing Kim discuss her life, any
reasonable juror was likely to carefully consider what
weight to give her testimony.

More importantly, the forced-sex testimony elicited on
direct and cross comprised only a mere handful of sen-
tences out of Kim's half-day-long testimony in a four-day
trial. There was also an abundance of other evidence
on which the jury could pin Ms. Lee's guilt. Additionally,
the government did not argue the forced sex in its sum-
mation—there was absolutely no pull on the jurors'
emotions asking them to convict her because she in
some way was affiliated with rape. The government
asked the jury to convict her on the evidence, of which
there was plenty. *See United States v. Dennis*, 497 F.3d 765,
770 (7th Cir. 2007) (mentioning the "overwhelming evi-
dence of [the defendant's] guilt" apart from evidence
admitted under Rule 404(b) in determining that any
Rule 404(b) error would have been harmless); *United States
v. Mallett*, 496 F.3d 798, 802 (7th Cir. 2007) (mentioning the
"overwhelming evidence of [the defendant's] guilt" apart
from evidence admitted under Rule 404(b)); *United States
v. Best*, 250 F.3d 1084, 1093-94 (7th Cir. 2001) (discussing the
importance of other "compelling" evidence on which to
convict the defendant, aside from Rule 404(b) testimony).

---

[5] (...continued)
"type," so, after another call, she went to the Rainbow Spa in
Toledo. The details she described of her life were truly nothing
short of odd.

There are also the limiting instructions to consider. Perhaps Ms. Lee has a point—that in some extreme instances a limiting instruction may be insufficient to quell the prejudice and the pull to convict on an impermissible emotional basis. However, if such a case exists, this is certainly not it; the mention of forced sex in Kim's testimony in context appears neither "shocking" nor "devastating" despite how Ms. Lee attempts to spin it in her briefs. The judge gave a limiting instruction before Kim's Rainbow Spa testimony instructing the jury that it was only to be considered for the limited purpose of establishing Ms. Lee's knowledge. At the conclusion of the Rainbow Spa testimony and before Kim began her testimony regarding the Rockford Spa, the judge again emphasized the limitation on the Rainbow Spa testimony. The limiting instruction was also given again at the end of closing arguments. "Absent any showing that the jury could not follow the court's limiting instruction, we presume that the jury limited its consideration of the testimony in accordance with the court's instruction." *Mallett*, 496 F.3d at 802. The extensive instruction was more than sufficient to fully counter the slim chance that Kim's testimony had a prejudicial effect. *See, e.g.*, *Dennis*, 497 F.3d at 769 (mentioning the mitigating impact of limiting instructions on any risk of prejudicial impact on the jury); *Best*, 250 F.3d at 1094 (mentioning the limiting instruction).

Therefore, there does not appear to be any danger of prejudice from the forced-sex testimony (let alone *unfair* prejudice). Nevertheless, even if there was, it was harmless error. "Error in admitting Rule 404(b) evidence

may be deemed harmless if we are convinced that the error did not influence the jury, or had but very slight effect, and can say with fair assurance . . . that the judgment was not substantially swayed by the error." *Dennis*, 497 F.3d at 769-70 (internal quotations omitted). Given the circumstances, the forced-sex testimony had no noticeable impact on Ms. Lee's conviction.[6]

---

[6] Ms. Lee also appeals the admission of "finger cot testimony" from FBI Agent Richman and the reference in FBI Agent Sealby's testimony to a newspaper article. These two arguments barely warrant discussion. The newspaper article itself was never shown to the jury. Instead an agent simply testified that an article in the Rockford Register Star instigated the investigations. This one minor mention was certainly harmless, and the jury was of course instructed not to look at any outside materials.

The finger cot testimony is also insignificant. After telling the jury where she seized finger cots at the spa, Agent Richman described that they were "basically condoms, tiny little condoms that go over one's finger, and are used to insert in someone's anus to stimulate the prostate gland. . . ." Ms. Lee then objected for lack of foundation and hearsay. Following the objection, the testimony was stricken from the record. Later, in the jury's absence, Ms. Lee moved for a mistrial, which the district judge denied. Considering that Ms. Lee was charged in connection with running a brothel, and since finger cots were mentioned, permissibly, to the jury as items found at the spa, explaining what a finger cot is to the jury was not unfairly prejudicial. The testimony was stricken and that sufficiently dealt with any problem the testimony could have presented.

### V. Sentencing Issues

We review the application of sentencing guidelines de novo. *United States v. Acosta*, 474 F.3d 999, 1001 (7th Cir. 2007). Mr. Lee was convicted on both counts of the superceding indictment—the conspiracy to use interstate facilities and the conspiracy to commit money laundering—on March 20, 2006. On July 17, 2006, he was sentenced to 51 months of imprisonment on both counts to run concurrently, three years' supervised release, a $250 fine, and a $200 special assessment. Ms. Lee was also convicted of both counts, on March 30, 2006. She was sentenced, on July 20, 2006, to 63 months of imprisonment on both counts to run concurrently, plus three years of supervised release, a $500 fine, and a $200 special assessment.

Both defendants' base offense levels for Count Two, the money laundering count, were calculated under U.S.S.G. § 2S1.1(a)(2), with cross-reference to U.S.S.G. § 2B1.1 to determine how many levels should be added. Following the sentencings, however, the trial judge determined that this calculation in Mr. Lee's case was erroneous and expressed this in a proceeding on August 24, 2006. The same error occurred in Ms. Lee's case. The government in its brief concedes that this calculation was erroneous, explaining that the base offense levels should have been calculated under U.S.S.G. § 2S1.1(a)(1). All parties seem to agree with this point, and because a sentence must be based on an accurate guideline calculation, *United States v. Garrett*, 528 F.3d 525, 527 (7th Cir. 2008), the sentences must be vacated with the cases remanded

for resentencing. Accordingly, all other arguments advanced with respect to sentencing are moot.

Moreover, given our conclusions above, overturning the convictions with respect to the money laundering counts, the Lees must be resentenced anyway, in light of that, upon remand.

## VI. Conclusion

We AFFIRM the convictions on the interstate facilities conspiracy claim and REVERSE the convictions for the money laundering conspiracy. With respect to the Lees' sentences, we VACATE and REMAND for resentencing.