In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 08-1486, 08-1678, 08-3789 & 08-4136

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

IGOR ASLAN, MIHAI PANAITESCU,
STEFAN DUMITRU and ADRIAN FECHETE,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 CR 923—**John W. Darrah,** *Judge.*

ARGUED MAY 25, 2010—DECIDED MAY 12, 2011

Before FLAUM, ROVNER, and WOOD, *Circuit Judges.*

ROVNER, *Circuit Judge.* Confidence games are as old as a pig in a poke, but the internet has changed the scale of the con to allow schemers to reach effortlessly across oceans into the pockets of their trusting marks.[1] The

---

[1] A "pig in a poke" is "something bought or accepted without prior inspection." OXFORD ENGLISH DICTIONARY (2010). The

(continued...)

defendants here ran a con for two and a half years using the most efficient "poke" that technology has to offer: eBay. The confidence men (and women) in this scheme, many of them based in Romania, posed as sellers of goods on eBay and other internet auction sites. They accepted payment via Western Union, collected by co-schemers at various locations in the Chicago area. The co-schemers then kept a percentage of the money for themselves and sent the balance to Romania. In each instance, the poke was empty: no goods were delivered to the buyers. This had the beneficial effect for the defendants of keeping costs down and profits high. Most of the defendants pled guilty; one was convicted after a trial. The one who went to trial appeals both his conviction and his sentence; the others appeal their sentences.[2]

---

[1] (...continued)
phrase refers to a confidence game originating in the Late Middle Ages, where the buyer of a pig would take delivery of the animal in a bag (also known as a poke), only to discover later that the poke contained an inferior pig or, worse, a cat.

[2] The appeal of Mihael Hann, Case No. 08-1697, was originally consolidated with these appeals. We subsequently severed Hann's appeal and decided it in an Order. *See United States v. Hann*, 2011 WL 463008 (7th Cir. February 9, 2011).

**I.**

The scheme was remarkably simple and uncommonly successful: offer items for sale through internet auction sites, collect payment, and then fail to deliver the goods. The only complication was collecting the money without being caught. Between November 2003 and August 2006, the defendants and their associates managed to fleece more than two thousand victims out of more than six million dollars. The Romanian originators of this scam (the government calls them the "Foreign Co-schemers" and we will, too) posed as sellers on eBay and other auction sites. They contacted buyers who had previously bid on items but failed to complete the transactions because they did not offer the highest bids. The Foreign Co-schemers sent email to the disappointed bidders extending "Second Chance Offers" to buy the items on which they had recently bid. A typical email displayed logos that made it appear as if eBay itself was extending the offer on behalf of the seller. Each email contained extensive information regarding protections eBay was providing against fraud. The Foreign Co-schemers were careful to mimic the language of legitimate eBay correspondence. For example, they referenced the "Security & Resolution Center," which is the actual name of a group at eBay that is designed to assist eBay users in resolving transactional disputes and reporting fraudulent activities. Because the Foreign Co-schemers believed that buyers would be reluctant to deal with foreign sellers and would be wary of wiring money to foreign countries, they employed collection agents (hereafter "U.S. Co-schemers") in the United States, including

in the Chicago area. Once the victim agreed to make a purchase, the Foreign Co-schemers would instruct the victim to send payment by wire transfer to one of the U.S. Co-schemers, typically through Western Union. To lessen the risk of being detected by authorities, the U.S. Co-schemers assumed false identities to collect the wired payments at various currency exchanges. The U.S. Co-schemers kept in continuous contact with their Romanian counterparts in order to communicate the constantly changing names the sellers should use when luring victims, and in order to obtain the money transfer control numbers issued by Western Union to the victims making the purchases. Once the U.S. Co-schemers received money transfer control numbers, they would use matching, fake identification documents to claim the funds from Western Union agents at various currency exchanges. After deducting their percentage of the proceeds, they would then forward the remainder to the Foreign Co-schemers. By returning a percentage to their Romanian counterparts, the U.S. Co-schemers would ensure that repeat business would be sent their way in future transactions. Each of the defendants here played a different role in the scheme for varying periods of time. We will address the appeals of each defendant separately.

## A.

Igor Aslan was charged with three counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. He pled guilty to one count of wire fraud pursuant to a plea

agreement. In exchange for his plea, the government agreed to dismiss the two remaining counts, to recommend that Aslan be sentenced within the applicable guidelines range, and to recommend that the court adjust Aslan's sentence to give him credit for time served in state custody for a related conviction. Aslan served ten months of a thirty-month sentence in state custody for possession of a fraudulent identification document, and subsequently spent several months in the custody of immigration officials before he was charged with the instant offense. The plea agreement did not bind the court to any particular sentence. The parties agreed that the applicable guidelines range was fifty-one to sixty-three months.

Although the court initially indicated an inclination to follow the government's recommendations, Aslan gave a lengthy elocution in which he said a number of unfortunate things that caused the trial judge to rethink his intention to credit Aslan for time served in state custody. Among other things, Aslan characterized a 1992 state court conviction as a "set-up." He declared, "I never stole, I never steal and I will never steal." After conceding that he was guilty of the crime charged here, he said, "But my responsibility in committing this crime, it's very limited." R. 455, Tr. at 13-14. He compared himself favorably to his co-schemers by noting that he "was never involved in false advertising," never recruited others into the scheme, and did not know that another group of collection agents was working in the Chicago area as part of the same scheme. R. 455, Tr. at 14-15. He also insisted that others in the scheme filled out the

paperwork to receive the money and that he simply signed the forms and took the money from the currency exchanges. He contended that he did not know "where the money came from," but that he simply collected it, kept ten percent and immediately handed the remainder over to others in the scheme. From his ten percent, he complained, he was forced to pay the cost of the fake id cards, leaving a "very small amount" for himself. R. 455, Tr. at 16-17. He offered the court an example of a collection for $2900, from which he was paid $290, which was further reduced to $190 after he paid for the fake id. "This is the truth," Aslan insisted, apparently unaware that the court might have more sympathy for the victim who lost the entire $2900, not to mention the seventy-four other victims whose money Aslan collected at various currency exchanges. He told the court that other participants were armed and were far more involved than he, and yet some were never arrested. He faulted the FBI for a "lack of professionalism" that led to fewer arrests than would have been possible if the Bureau had given more attention to certain information. He repeated his claim that he had "never stolen anything," and asked "please to be considered for a small punishment." R. 455, Tr. at 20. He conceded that "the victims were defrauded," but complained that "my amount, it's extremely small. If one would calculate after what my earnings were, it's nothing federal here." R. 455, Tr. at 20.

Needless to say, the district court was not impressed by Aslan's attempt to divest himself of responsibility for the tremendous harm he caused the victims of his crimes:

> I listened very carefully to the statement you made to me. There was no expression of contrition, no expression of regret, no acknowledgment of the harm that you have caused or the number of people your conduct has caused harm to. You never really admitted that you were wrong. Instead, you asked me to focus on the relatively small amount of money that you made out of this.

R. 455, Tr. at 23. The court then considered the Section 3553(a) factors and determined that a sentence at the high end of the guidelines, sixty-three months, was appropriate for Aslan. The court declined to give Aslan credit for time served in state custody and instead stated, "I intend that this sentence be served as I pronounce it." R. 455, Tr. at 23. The court also ordered restitution in the amount of $187,982.48, and a three-year period of supervised release.

Aslan's lawyer moved to withdraw under *Anders v. California*, 386 U.S. 738 (1967), contending that Aslan had no non-frivolous issue to raise on appeal. Aslan responded to our invitation to reply to his attorney's motion. *See* Circuit Rule 51(b). We confine our review of the record to the potential issues raised in the attorney's facially-adequate brief and Aslan's Rule 51(b) response. *United States v. Schuh*, 289 F.3d 968, 973-74 (7th Cir. 2002); *United States v. Tabb*, 125 F.3d 583, 584 (7th Cir. 1997).

Aslan's attorney presents two potential issues for review: whether the district court abused its discretion in denying Aslan credit for the time he served in state custody on a conviction for conduct related to the

federal charges in this case, and whether the court abused its discretion in denying Aslan credit for the time he served in immigration custody. Our review of sentencing decisions is limited to whether they are reasonable, applying the abuse of discretion standard. *Gall v. United States*, 552 U.S. 38, 46 (2007). We first must ensure that the district court committed no significant procedural error. *Gall*, 552 U.S. at 51. Procedural errors include, among other things, failing to calculate or incorrectly calculating the guidelines range, treating the guidelines as mandatory, failing to consider the § 3553(a) factors, or failing to explain adequately the chosen sentence, including an explanation for any deviation from the guidelines range. *Gall*, 552 U.S. at 51. If the district court's decision is procedurally sound, we then consider the substantive reasonableness of the sentence using the abuse of discretion standard. *Gall*, 552 U.S. at 51. We review the district court's interpretation of the sentencing guidelines *de novo*. *United States v. Veazey*, 491 F.3d 700, 706 (7th Cir. 2007); *United States v. Chamness*, 435 F.3d 724, 726 (7th Cir. 2006). Sentences that are within the properly calculated guidelines range are entitled to a rebuttable presumption of reasonableness. *Rita v. United States*, 551 U.S. 338, 341-49 (2007); *Veazey*, 491 F.3d at 706; *United States v. Rodriguez-Alvarez*, 425 F.3d 1041, 1045 (7th Cir. 2005); *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005). Counsel correctly notes that the plea agreement did not hold the court to any particular sentence, and this sentence was within the guidelines range. It is therefore entitled to a presumption of reasonableness.

Aslan's state court sentence was imposed after he pled guilty to possession of a fraudulent identification document. Because the conduct for which the sentence was imposed was part of the instant offense, Aslan accrued no criminal history points for that conviction. R. 179-1, Plea Agreement, ¶ 6(g)(i). Counsel correctly notes that Aslan is not entitled to an adjustment under the federal statute that determines when an inmate is entitled to credit for prior custody:

> Credit for prior custody.—A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences—
>
>> (1) as a result of the offense for which the sentence was imposed; or
>>
>> (2) as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed;
>
> that has not been credited against another sentence.

18 U.S.C. § 3585(b). Aslan's time in state custody was not as a result of the offense for which the federal sentence was imposed. Rather, it was for a separate state offense. Indeed, no federal charges were even filed until after Aslan was released from state custody. All of the time that Aslan spent in state custody was credited toward his state sentence and he is therefore ineligible for any Section 3585 credit.

Moreover, under Section 3584, "[m]ultiple terms of imprisonment imposed at different times run consecu-

tively unless the court orders that the terms are to run concurrently." In determining whether to order the terms to run concurrently or consecutively, the court must consider the factors set forth in Section 3553(a). *See* 18 U.S.C. § 3584(b). The court thoroughly considered the factors set forth in Section 3553(a), noting that Aslan failed to express any remorse for his crime, and that a sentence at the high end of the guidelines was necessary to deter others and also to protect the public from Aslan's continued crimes. The court noted that Aslan's history demonstrated that there was no chance he could be rehabilitated, and that if he were free to do so, he would continue to commit the same kinds of crimes. Based on Aslan's criminal history, his conduct in the current offense and his complete failure to take responsibility for the harm he caused, the court characterized him as "truly a dangerous person." There was no abuse of discretion in this assessment.

Counsel next considered whether the court erred in not crediting Aslan for the time he served in the custody of immigration authorities after he was released from custody in the state offense. Aslan was in custody for approximately four months on an outstanding deportation warrant before he was arrested for the instant offense. Counsel correctly notes that Aslan was not under a federal sentence during the time he was in administrative custody. For that reason, he is not entitled to any relief under Section 3585(b). The court certainly had the discretion to take the period of immigration detention into account in setting Aslan's sentence, but

did not abuse its discretion in determining that Aslan must serve the sentence imposed in full.

Aslan does not raise any additional issues in his Circuit Rule 51(b) response. In that response, he simply complains that his attorney promised to get him out of jail in exchange for $10,000 and a guilty plea. He seeks appointment of new counsel to assist him in his appeal. Of course, in his plea agreement, Aslan contradicted the version of events he would now have us believe. In his plea agreement, he assured the court that he was pleading guilty because he was in fact guilty. He also confirmed that "no threats, promises, or representations have been made, nor agreements reached, other that those set forth in this [plea] Agreement, to cause defendant to plead guilty." R. 179-1, ¶¶ 5, 19. The plea agreement also specified the correctly calculated guidelines range and the statutory maximum sentence. His contradictory claim now that his attorney promised to get him out of jail for $10,000 and a guilty plea does not entitle Aslan to the new counsel that he requests. Because he has no non-frivolous issues for appeal, we therefore grant his attorney's motion to withdraw and dismiss his appeal.

## B.

Mihai Panaitescu was charged with one count of wire fraud in violation of 18 U.S.C. §§ 1343 and 2. He pled guilty to that count pursuant to a plea agreement. Like Aslan, Panaitescu was one of the U.S. Co-schemers who assumed a series of false identities to collect payments

at currency exchanges, keeping some for himself and forwarding the remainder to the Foreign Co-schemers. Panaitescu had previously pled guilty to a different charge of wire fraud and was serving a nineteen-month sentence for that conviction when he was indicted in the instant case. The government refers to that prior matter as the *Moloman* case, nicknamed for one of Panaitescu's co-defefendants in that case. While still in federal custody on the *Moloman* conviction, Panaitescu was arrested and taken before a federal magistrate for an initial appearance on the new charges. He waived his right to a detention hearing and the court granted the government's motion to detain Panaitescu pending trial on the new charges. Panaitescu pled guilty to the new charges on June 6, 2007 and was sentenced on March 13, 2008. At the time of his sentencing, Panaitescu had served more than twenty-seven months in prison. Thus, he had fully served his prior nineteen-month sentence in the *Moloman* case before he was sentenced on the wire fraud count at issue here. He remained in prison at the conclusion of that sentence because, as we noted, the court had ordered him detained pending the resolution of the new charges.

Panaitescu now complains that he never received official notification that his sentence in the *Moloman* case had been discharged. Without that official notification, he argues that his prior sentence was not discharged. And because that sentence had not been discharged, he contends, the court could have ordered that his sentence in the instant case run concurrently with the sentence in the *Moloman* case. Prior to his sentencing in the instant

case, the government requested that the Bureau of Prisons ("BOP") provide documentation regarding the status of the *Moloman* sentence. The BOP then produced a document that listed an expected "release" date of May 31, 2007. In light of that document, the district court refused to order that the instant sentence run concurrently with the *Moloman* sentence because the *Moloman* sentence had been fully discharged prior to sentencing in this case. Panaitescu now complains that the court erred in relying on this unofficial document that did not purport to discharge his sentence. Without the official discharge, he contends he was entitled to consideration of his request for concurrent sentencing.

We need not reach the substance of Panaitescu's novel and dubious claim regarding whether his sentence could run concurrently with the prior sentence in the absence of an official "discharge" document. Panaitescu's plea agreement contained a broad waiver of his right to appeal his sentence:

> Defendant is aware that Title 18, United States Code, Section 3742 affords a defendant the right to appeal a sentence. In exchange for the concessions made by the government in this plea agreement, defendant knowingly waives the right to appeal any sentence within the maximum provided in the statute of conviction, or the manner in which that sentence was determined. The defendant also waives his right to challenge the sentence in any collateral attack, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The

> waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel which relates directly to this waiver or its negotiation.

R. 169, ¶ 12.

Panaitescu contends that the issue he now appeals is outside the scope of the waiver in his plea agreement. He claims he is not appealing the length of his sentence or the manner in which it was calculated. Rather, he is challenging the court's ruling on the status of his *prior* sentence, which in turn caused the court to reject his request to serve the instant sentence concurrently with his prior sentence. A decision by the court to impose a consecutive sentence easily comes within the language of the waiver, which prevents Panaitescu from challenging a sentence within the statutory maximum or the manner in which that sentence was determined. The statutory maximum for wire fraud is a twenty-year term of imprisonment. 18 U.S.C. § 1343. The court sentenced Panaitescu to a term of fifty-eight months, well within the statutory maximum. Under 18 U.S.C. § 3584 and Section 5G1.3(c) of the Sentencing Guidelines, a district court may run a new prison sentence concurrently, partially concurrently, or consecutively to an undischarged term of imprisonment based on certain considerations. That determination necessarily involves "the manner in which that sentence is determined," which is also covered by Panaitescu's appeal waiver. We will enforce an appellate waiver if its terms are express and unambiguous, and the record shows that the defendant knowingly and voluntarily entered into the agreement. *United States v. Chapa*, 602 F.3d 865, 868 (7th Cir. 2010).

Those conditions are met here. We therefore dismiss Panaitescu's appeal.

## C.

Stefan Dumitru[3] was charged with three counts of wire fraud in violation of 18 U.S.C. §§ 1343 and 2, and one count of receipt of stolen funds that had been transported interstate, in violation of 18 U.S.C. § 2315. Dumitru pled guilty to one count of wire fraud pursuant to a plea agreement. Dumitru's role in the scheme was similar to that of Aslan and Panaitescu. Dumitru assumed a series of false identities to collect payments at currency exchanges, keeping a cut for himself and forwarding the rest to the Foreign Co-schemers. No later than March 2005, Dumitru learned about the existence and nature of the internet fraud scheme from co-defendant Raimondoray Cerna.[4] Between March and December of 2005, Dumitru collected almost $100,000 from thirty-three different victims.

---

[3] Dumitru's real name is Petru Hanea. He was indicted under the name "Stefan Laurentiu Dumitru," an alias he assumed while living in the United States. The indictment, plea agreement and judgment all refer to him as Dumitru and so we will use that name as well.

[4] Cerna's case is not part of this appeal. The scheme involved at least twenty defendants, and their cases have proceeded through the district court on different time lines. We will mention some of these other defendants when it is necessary to explain the issues relevant to the defendants in the instant appeal.

At the time of the plea agreement, the government posited that the amount of loss involved in the jointly undertaken criminal activity that was foreseeable to Dumitru was greater than $400,000 but less than $1,000,000. Dumitru would concede only that the amount of loss foreseeable to him was greater than $70,000 but less than $120,000. The government's calculations called for a fourteen-level increase in the base offense level, and Dumitru's concession warranted only an eight-level increase. Similarly, the government asked for an additional six-level increase in the offense level because the offense involved more than 250 victims. Dumitru claimed that only a two-level increase was appropriate, pegging the number of victims between ten and fifty. In the plea agreement, the parties reserved their right to argue these positions at sentencing.

The government urged the court to adopt the recommendation of the Presentence Investigation Report ("PSR"). The PSR recommended that the court find that the amount of foreseeable loss was more than $400,000 but less than $1,000,000, and that the number of victims was greater than 250. The evidence presented in support of that recommendation included information that Dumitru received fraudulent Western Union transactions from both leaders of the scheme, Cerna and Adrian Fechete.[5] Dumitru, who recruited Hann into the scheme, used the same currency exchanges as Marian Alexandru,

---

[5] We address Fechete's appeal in Section D, below.

Fechete and Hann.[6] He also shared information with several of his co-defendants on which currency exchanges were favorable places to collect the funds. Indeed, many of the defendants repeatedly used the same currency exchanges. For example, Dumitru and six of his co-schemers all collected fraud proceeds at the Foster Currency Exchange in Chicago, totaling thirty-one transactions at that single exchange. Dumitru and his co-schemers frequently received fraud proceeds from the same currency exchange on the same day. He sometimes shared rides to currency exchanges with Hann and Fechete. Dumitru used the same email addresses as his co-schemers to receive Western Union transaction information from the Foreign Co-schemers. Similarly, he deposited fraud proceeds into bank accounts which were used by Hann, Alexandru and others for that same purpose. He obtained false identification documents from the same source as Hann, and these documents bore similarities to those used by Cerna and Alexandru. Cell phone information also tied Dumitru to his co-schemers.

The district court found that Dumitru could reasonably be held to foresee the conduct of several other co-schemers, including co-defendants Cerna, Ioan Moloman, Panaitescu, Hann, Aida Salem, Fechete and Alexandru.[7] The court noted (and Dumitru's counsel agreed) that the foreseeable conduct of Hann and Moloman alone would

---

[6]  Alexandru's case is not part of this appeal.

[7] The cases of Moloman and Salem are not part of the instant appeal.

bring the number of victims to 255 and the loss to an amount between $400,000 and $1,000,000. In concluding that the conduct of these co-defendants was foreseeable to Dumitru, the court considered the government's evidence regarding the similarity of the *modus operandi*, coordination among co-schemers, facilitation of fraudulent acts committed by others, knowledge of the scope of the scheme, the length and degree of the participants' involvement in the scheme, and the pooling of resources and benefits. The court credited this evidence as being sufficient to support a finding that Dumitru could be held responsible for more than 250 victims and losses between $400,000 and $1,000,000.

On appeal, Dumitru posits that he should have been held responsible only for those transactions in which he personally was involved. He faults the district court for applying *United States v. Adeniji*, 221 F.3d 1020 (7th Cir. 2000) in determining how to calculate the loss to be attributed to a defendant under Section 1B1.3 of the Sentencing Guidelines. He urges us instead to adopt the Second Circuit's approach in *United States v. Studley*, 47 F.3d 569 (2d Cir. 1995). He concedes that we rejected *Studley* in *United States v. Boatner*, 99 F.3d 831 (7th Cir. 1996), but asks that we reconsider the issue because he believes the Second Circuit's approach is more precise and a better interpretation of the Sentencing Guidelines. Using that approach, he contends that the evidence was insufficient to demonstrate that he could reasonably foresee that the conduct of his co-schemers would result in losses in excess of $400,000 to more than 250 victims. He characterizes his participation as limited to picking

up proceeds and complains that there was no evidence that he agreed to participate in the scheme as a whole. He claims he did not know the magnitude of his co-defendants' participation, that he had no role in luring the victims, driving others around, organizing money pick-ups, or coordinating the activities of others.

In calculating a defendant's offense level under the Sentencing Guidelines, a court must determine the base offense level and then apply the guidelines for specific offense characteristics. *United States v. Salem*, 597 F.3d 877, 884 (7th Cir. 2010). "Specific offense characteristics depend not only on the offense of conviction but also on relevant conduct." *Salem*, 597 F.3d at 884. Section 1B1.3 of the sentencing guidelines addresses, among other things, relevant conduct in the case of jointly undertaken criminal activity. That Section provides that the base offense level is determined on the basis of:

> all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and . . . in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity[.]

U.S.S.G. § 1B1.3(a)(1). A court assessing a defendant's liability under the relevant conduct provision must engage in a two-pronged analysis. With respect to the loss amount that can be attributed to a defendant, the

court must determine (1) whether the acts resulting in the loss were in furtherance of jointly undertaken criminal activity; and (2) whether those acts were reasonably foreseeable to the defendant in connection with that criminal activity. *Salem*, 597 F.3d at 884-86; *Adeniji*, 221 F.3d at 1027.

Dumitru characterizes his objection to the district court's findings as to both the scope of activity for which he was held accountable and to the foreseeability of the conduct of others. The government notes that in the district court, Dumitru objected only to the foreseeability of the conduct of others in the scheme. The government contends that by limiting his objection to the issue of reasonable foreseeability, Dumitru waived his objection to a finding that he engaged in certain joint criminal activity with his co-schemers. We have reviewed Dumitru's "Defendant's Sentencing Memorandum" ("Sentencing Memorandum") (R. 694) and the transcript of his sentencing hearing, and conclude that the government is correct. In his Sentencing Memorandum, Dumitru describes his objection as to the foreseeability of the loss only. He never objected to the characterization of the scope of jointly undertaken criminal activity contained in the PSR or in the government's version of the crime. The government clarified in its "Position Paper for Sentencing of Defendant Stefan Laurentiu Dumitru" (R. 696) ("Position Paper"), that Dumitru did not object to the scope of the jointly undertaken criminal activity:

> Defendant does **not** argue that [sic] in his position paper that the government failed to prove that he

> engaged in joint criminal activity with his co-schemers; such a position would certainly be frivolous under the circumstances.

R. 696, Position Paper, at 7-8 (emphasis in original). Rather, the government characterized Dumitru's objection as being solely to the foreseeability of the loss caused by his co-schemers' conduct. Dumitru did not object to this characterization. In fact, when the court asked at sentencing whether Dumitru's principal theory was that Dumitru was not responsible for any conduct other than the thirty-three victims he personally defrauded out of $99,000 because no other conduct was foreseeable to him, his counsel replied, "That's the principal theory, Judge, and we rest on that." Given this sequence of exchanges, we conclude that Dumitru waived any objection to the scope of jointly undertaken criminal activity and limited his objection to foreseeability only. "Waiver is the intentional abandonment of a known right, and precludes appellate review." *United States v. Haskins*, 511 F.3d 688, 693 (7th Cir. 2007). Dumitru knew he could object to the scope of jointly undertaken criminal activity and did not. He likely declined to contest the scope of the jointly undertaken criminal activity in order to preserve the sentencing reduction he enjoyed for acceptance of responsibility. *Salem*, 597 F.3d at 890. We will therefore review only whether the court erred in finding that loss greater than $400,000 to more than 250 victims was reasonably foreseeable to Dumitru.

We review the court's foreseeability finding for clear error. *United States v. Hernandez*, 325 F.3d 811, 817 (7th

Cir. 2003). Foreseeability is not equivalent to actual knowl-edge. *Hernandez*, 325 F.3d at 817. A defendant need not know of a co-schemer's actions for those actions rea-sonably to be foreseeable to the defendant. We see no error in the district court's conclusion that losses of this magnitude to this many victims were foreseeable to Dumitru. Having recruited Hann into the scheme, Dumitru also shared with several of his co-schemers access to fake identification documents, information regarding which currency exchanges were favorable to the scheme, rides to the currency exchanges, and bank accounts through which fraudulent funds were chan-neled. That was more than enough to find that the losses caused by the jointly undertaken criminal activity of his co-schemers were reasonably foreseeable to him.[8] Finding no error in the court's findings, we affirm Dumitru's sentence.

---

[8] Because Dumitru limited his objections to foreseeability, the Second Circuit's approach in *Studley* is irrelevant to our analysis. *Studley* aims to define the factors a court should consider in determining the scope of jointly undertaken criminal activity. *Studley*, 47 F.3d at 574-75. Dumitru did not contest the government's characterization of the scope of the jointly undertaken criminal activity. He complained only about the court's finding that he could reasonably foresee that the criminal conduct of his co-schemers would cause more than $400,000 in losses to more than 250 victims.

**D.**

That brings us to the appeal of Adrian Fechete, the only defendant in these consolidated appeals to go to trial. Fechete was charged with six counts of wire fraud in violation of 18 U.S.C. § 1343, three counts of receiving stolen property that had been transported interstate in violation of 18 U.S.C. § 2315, one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h), and one count of aggravated identity theft in violation of 18 U.S.C. § 1028A. A jury found Fechete guilty of all charges, and the district court subsequently sentenced him to 324 months of imprisonment, by far the lengthiest sentence for any of the co-schemers in these appeals.

Like the other defendants, Fechete assumed false identities to collect payments sent by unsuspecting eBay shoppers via Western Union. Fechete participated in the scheme from approximately November 2004 to March 2006. He personally collected more than $180,000 from approximately seventy victims. Like his cohorts, he forwarded a large percentage of this money to the Foreign Co-schemers, generally using Western Union and Moneygram wire transfers. Fechete lived with Cerna, another leader of the scheme, during the early months of his participation. Cerna managed a crew of collection agents including Fechete, Moloman and Salem. Fechete shared rides to currency exchanges with Panaitescu and Moloman, and shared information with his co-schemers about which currency exchanges were favorable. After Fechete had a falling-out with

Cerna, he moved out and formed his own crew of collection agents, recruiting new members to the scheme. Fechete managed the activities of Denis Busta, Gary Schneider and Jessie Vega as well as the individuals Schneider and Vega recruited. At Fechete's direction, Schneider collected victims' funds from currency exchanges and transmitted fraud proceeds to the Foreign Co-schemers. Fechete sometimes paid Schneider to transmit Fechete's fraud proceeds to Romania because Fechete had already sent too much money in his own name and wished to avoid calling attention to himself. Fechete also kept a cut of Schneider's collections for himself before the remainder was wired to the Foreign Co-schemers in Romania.

When Fechete felt that Schneider's collection activities might be reaching a level that would draw attention from law enforcement, he directed Schneider to recruit additional collection agents who would be willing to pick up money from Western Union in their own names in exchange for cash payments. Schneider recruited thirteen friends and acquaintances to receive wired fraud proceeds from currency exchanges. Schneider provided the names of his recruits to Fechete via text message, and Fechete then transmitted those names to the Foreign Co-schemers for use in soliciting victims on eBay and other auction sites. Schneider's recruits collected approximately $365,000 from eighty-four victims in a three-month period in 2005. From these fraud proceeds, the recruits were paid a nominal sum, and Fechete and Schneider each took a cut before trans-

mitting the rest to Romania. Fechete was careful to use Schneider's recruits to transmit fraud proceeds to Romania to avoid the attention of the Internal Revenue Service and other government agencies.

Fechete similarly directed Vega to recruit others who would be willing to use their own names to collect victims' money from currency exchanges. Vega recruited approximately nine friends, who each used their own names to pick up fraud proceeds for periods of one or two weeks. As with Schneider, Vega provided names via text messages to Fechete, who then transmitted those names to the Foreign Co-schemers. The Foreign Co-schemers lured the victims using those names and induced the victims to wire money to Vega's recruits. The recruits were paid a nominal amount to collect the proceeds at currency exchanges and Vega kept a twenty-percent cut before turning over the remainder to Fechete. In a six-month period in 2005, Vega and his recruits collected approximately $343,000 from seventy-nine victims.

When Fechete was arrested, law enforcement agents searched his apartment and recovered, among other things, a number of counterfeit identification documents and a loaded 9mm Glock semi-automatic pistol, which was hidden in a hole beneath the false bottom of a bathroom cabinet. Law enforcement also recovered an envelope addressed to Moloman and documents in the name of an alias used by co-schemer Salem. Fechete's cell phone contained contact information for Schneider and Vega. The phone was registered to Moloman's address and call records documented

frequent calls to co-schemers Cerna, Moloman and Constantin Lucan.[9]

After a jury convicted Fechete on all charges, the court held a sentencing hearing where Fechete objected to the amount of loss and number of victims attributed to him as relevant conduct. He also argued against a two-level increase for possession of a dangerous weapon in connection with the fraud scheme. The court found that Fechete alone was directly responsible for defrauding sixty-four victims in amounts totaling $186,000. The court also found that Fechete recruited, trained and supervised Schneider and Vega and that their conduct was "particularly foreseeable" to him. Schneider and Vega together collected $708,000 from 163 victims. The court calculated that Fechete was responsible for stealing $927,000 from 238 victims counting the losses and victims for Fechete, Schneider and Vega alone. The court also found that the conduct of Moloman, Panaitescu and Salem were also foreseeable to Fechete, based on their parallel use of telephones and phone numbers, extensive phone calls among them, and the use of a common residence. The court therefore concluded that Fechete would be held liable for losses exceeding $1,000,000 to more than 250 victims. The court also concluded that the Glock pistol recovered from Fechete's home was used in connection with the offense.

On appeal, Fechete challenges his convictions for money laundering and aggravated identity theft. He

---

[9] Lucan's case is not part of this appeal.

also contends that the court erred in sentencing him when it failed to hold the government to its burden of proving relevant conduct by a preponderance of the evidence and when it failed to make requisite findings regarding reasonably foreseeable losses and victims. Finally, he challenges the enhancement for possession of a firearm in connection with the offense.

**1.**

Count Eighty-Seven of the Superseding Indictment ("Indictment") charged Fechete with conspiring to commit money laundering in violation of 18 U.S.C. §§ 2, 1956(a)(2)(B)(i) and (h). R. 196. Specifically, the Indictment charged that Fechete, Cerna, Salem, Moloman, Alexandru, Panaitescu, Schneider and others:

> conspired to transmit and transfer funds from a place in the United States to a place outside the United States knowing that the funds involved in the transmission and transfer represented the proceeds of some form of unlawful activity, namely, violations of Title 18, United States Code, Section 1343 (wire fraud) and violations of Title 18, United States Code, Section 2315 (receipt of stolen property transmitted interstate), knowing that the transmission and transfer was designed, in whole and in part, to conceal and disguise the nature, location, source, ownership and control of the proceeds of such specified unlawful activity, in violation of Title 18, United States Code Section 1956(a)(2)(B)(i).

R. 196, at 18-19. The Indictment specified (and the gov-
ernment proved at trial) that Fechete transmitted the
Foreign Co-schemers' share of the wire fraud proceeds to
Romania after taking his own cut and also after paying
any U.S. Co-schemers who had participated in a
particular act of wire fraud.[10] Fechete argues for the first
time on appeal that the evidence was insufficient to
support his conviction for money laundering because
the government failed to establish that the money trans-
ferred to Romania was "proceeds" of wire fraud as that
term has been defined by the Supreme Court and by this
court.

We will overturn a jury verdict for insufficiency of the
evidence only if, after viewing the evidence in the light
most favorable to the government, the record is devoid
of evidence from which a reasonable jury could find guilt
beyond a reasonable doubt. *United States v. Vaughn*,
585 F.3d 1024, 1028 (7th Cir. 2009), *cert. denied*, 130 S. Ct.
3385 (2010); *United States v. Boisture*, 563 F.3d 295, 298
(7th Cir. 2009); *United States v. Groves,* 470 F.3d 311, 323-24
(7th Cir. 2006). Because Fechete did not challenge

---

[10] Although the Indictment specifies that the proceeds of both
the wire fraud counts and the stolen property counts were
laundered through transmissions to Romania, both the gov-
ernment and Fechete focus exclusively on the wire fraud
proceeds in their briefs. For the purposes of this case, there is
no reason to treat the proceeds of these two crimes differ-
ently. For the sake of simplicity, we will refer only to the
wire fraud proceeds even though our reasoning applies
with equal force to the stolen property proceeds.

his conviction for money laundering in the district court and did not object to the jury instructions on this count, we review the conviction for plain error. Fed. R. Crim. P. 52; *United States v. Olano*, 507 U.S. 725, 731 (1993); *United States v. Ali*, 619 F.3d 713, 718-19 (7th Cir. 2010), *cert. denied*, 131 S. Ct. 965 (2011); *United States v. Dokich*, 614 F.3d 314, 318 (7th Cir. 2010); *United States v. Rodgers*, 610 F.3d 975, 978 (7th Cir. 2010). In order to reverse for plain error, we must find (1) error (2) that is plain, and (3) that affects the defendant's substantial rights. *Olano*, 507 U.S. at 732; *Ali*, 619 F.3d at 719; *Dokich*, 614 F.3d at 318; *Rodgers*, 610 F.3d at 978. An error is plain if it is clear or obvious. *Olano*, 507 U.S. at 734. An error "affects the defendant's substantial rights" when it is prejudicial, that is, when it has affected the outcome of the district court proceedings. *Olano*, 507 U.S. at 734. Finally, we note that the correction of a forfeited error under Rule 52(b) is permissive, not mandatory. Fed. R. Crim. P. 52; *Olano*, 507 U.S. at 735. A court of appeals "should correct a plain forfeited error affecting substantial rights if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Olano*, 507 U.S. at 736 (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)).

To convict Fechete on the money laundering count, the government was required to prove that Fechete engaged in a conspiracy (1) in order to transmit funds from the United States to Romania; (2) knowing that the funds represented the proceeds of unlawful activity (in this instance, wire fraud and receipt of stolen property); and (3) knowing that the transmission was

designed in whole or in part to conceal or disguise the nature, the location, the source, or the control of the proceeds of specified unlawful activity. 18 U.S.C. § 1956(a)(2)(B)(i); *Regalado Cuellar v. United States*, 128 S. Ct. 1994, 2002 (2008). The only part of his conviction that Fechete challenges is whether the government provided sufficient evidence that the funds he transmitted to Romania represented the "proceeds" of unlawful activity. He bases this argument on the Supreme Court's opinion in *United States v. Santos*, 128 S. Ct. 2020 (2008) (hereafter "*Santos II*"), which was issued after Fechete's trial and conviction, and on our opinion in *United States v. Scialabba*, 282 F.3d 475 (7th Cir. 2002). Both opinions addressed the meaning of the term "proceeds" in the money laundering statute.

Under Fechete's reading of these cases, the term "proceeds" in the federal money laundering statute means the net profits of criminal activity and not the gross receipts of that activity. Fechete argues that both this court and the Supreme Court limited the meaning of the term "proceeds" under the rule of lenity, which requires that ambiguous criminal laws be interpreted in favor of defendants. According to Fechete, both courts also limited the meaning of "proceeds" to net profits because interpreting the term to mean gross receipts would result in a "merger problem," where nearly every predicate offense for money laundering would also constitute money laundering. That is, the same conduct that led to a conviction for the predicate offense would also lead to a conviction for money laundering. Because the government concedes that it did not prove at trial

that the money Fechete wired to Romania represented the net profits of the internet fraud scheme, Fechete contends that the conviction should be reversed. The government contends that both *Scialabba* and *Santos II* addressed only promotional money laundering and that the same reasoning does not apply to concealment money laundering, the prong of the statute under which Fechete was convicted. According to the government, it is not clear if there was error because there is no merger problem with concealment money laundering and the predicate offense of wire fraud. Because the error (if there was one) was not clear, the government contends that the conviction should stand. We note that the jury here was not instructed as to the meaning of proceeds. We begin by analyzing the reasoning of *Scialabba* and both *Santos* cases, and, along the way, we will discuss the differences between promotional money laundering and concealment money laundering, the latter being at issue here.

In *Scialabba*, the defendants ran an illegal gambling operation using video poker machines in bars, taverns and restaurants (we will use "bars" collectively to refer to the businesses that operated the machines). *Scialabba*, 282 F.3d at 475. Cechini owned the business that provided the machines to bars, and Scialabba was his assistant. Patrons dropped coins into the machines and earned on-screen credits if they won. With the credits, they could continue to play additional games (a lawful use of the machines) or they could receive a cash payout (an unlawful use). Many of the bars that operated the poker machines redeemed the credits for cash.

When the defendants collected the contents of the machines' coin boxes, they split the money with the bars' owners. Some of the money was used to cover the payments to players who had redeemed their credits for cash; some was used to compensate the bar owners for their participation in the scheme; and the rest was retained by the defendants. Some of that money retained by the defendants was undoubtedly profit and some was used to purchase and maintain the machines. 282 F.3d at 475-76.

The defendants were convicted of running an unlawful gambling business, filing false tax returns, conspiring to defeat tax collection from the bars' owners, and money laundering. They appealed only the money laundering convictions; those counts substantially increased their prison terms. Both Cechini and Scialabba were charged under § 1956(a)(1) on the theory that they violated the statute when they handed some of the money in the coin boxes to the bar owners and used some of that revenue to meet the expenses of the business (such as leasing the machines and obtaining amusement licenses for them from the state). *Scialabba*, 282 F.3d at 476. We noted that none of the defendants' conduct entailed financial transactions to hide or invest profits in order to evade detection, the normal understanding of money laundering. Rather, the focus was entirely on the disposition of the gross income of the operation and, accordingly, the convictions rested on the proposition that gross income is "proceeds" under the statute. 282 F.3d at 476.

Because the statute lacked a definition of "proceeds" (it has one now—more on that later), we considered the ordinary meaning of that word in the business setting. In the context of lawful gambling, we found that the more sensible interpretation of "proceeds" would be net profits. Citing the rule of lenity, we noted that it would have been easy for Congress to use the word "receipts" in lieu of "proceeds" if it had meant to include gross income. *Scialabba*, 282 F.3d at 477. We also noted that if we treated the "proceeds" as synonymous with "gross receipts," we would have to consider the additional question of "whether, as a matter of statutory construction (distinct from double jeopardy), it is appropriate to convict a person of multiple offenses when the transactions that violate one statute necessarily violate another." *Scialabba*, 282 F.3d at 477. By interpreting "proceeds" as profits, we noted we would eliminate any overlap between statutes. We therefore held "that the word 'proceeds' in § 1956(a)(1) denotes net rather than gross income of an unlawful venture." *Scialabba*, 282 F.3d at 478.

The government asked us to reconsider that holding in *United States v. Santos*, 461 F.3d 886 (7th Cir. 2006) (hereafter "*Santos I*"). Santos and his co-defendant Diaz ran an illegal lottery and, like the *Scialabba* defendants, were charged with money laundering under § 1956(a)(1)(A)(i). They were charged under that subsection with conspiring to use the proceeds of an illegal gambling business to promote the carrying on of the business. They were also charged in a substantive money laundering count with laundering funds by completing a financial transaction with the proceeds of the illegal gambling

business with the intent to promote the carrying on of the business. Both counts were premised, then, on "promotional" money laundering, that is, using the proceeds of unlawful activity to promote an unlawful activity. *Santos I*, 461 F.3d at 888. The government proceeded at trial (a trial that pre-dated our decision in *Scialabba*) under the theory that proceeds meant gross receipts as opposed to net income. The defendants then were convicted on evidence that the government conceded would not support a conviction if "proceeds" meant net rather than gross income. Although the convictions were affirmed on direct appeal, the district court later granted *habeas corpus* relief under 28 U.S.C. § 2255, and vacated the convictions. *Santos I*, 461 F.3d at 888-89.

The government appealed the district court's grant of *habeas* relief, urging us to overturn *Scialabba*. We noted that the unlawful activity at issue was running an illegal lottery. The financial transactions that were the subject of the money laundering counts were payments to the lottery's winners and to the middlemen, collection agents and runners who ran the scheme for the defendants. For Diaz, the money laundering conspiracy conviction was based on payments he received for collection services for the lottery. For Santos, the money laundering charges were based on payments he made to the middlemen and to the lottery's winners. We noted that *Scialabba*, applying the rule of lenity and also seeking to avoid convicting a person of multiple offenses when the transactions that violate one statute necessarily violate another, interpreted the term "proceeds" in Section 1956(a)(1) to mean net income. *Santos I*, 461 F.3d at 890.

*See also Scialabba*, 282 F.3d at 475 ("We conclude that, at least when the crime entails voluntary, business-like operations, 'proceeds' must be net income; otherwise the predicate crime merges into money laundering (for no business can be carried on without expenses) and the word 'proceeds' loses operational significance."). Applying *Scialabba* to the facts presented by the government against Santos and Diaz, we found that the district court correctly vacated the convictions. *Santos I*, 461 F.3d at 891.

We declined to overrule *Scialabba* and rejected the notion that *Scialabba* eviscerated the promotional prong of Section 1956(a)(1). *Santos I*, 461 F.3d at 892-93. We drew a distinction between paying expenses of a criminal operation and reinvesting net income:

> While, under *Scialabba*, the act of paying a criminal operation's expenses out of its gross income is not punishable under § 1956(a)(1)(A)(i)—but rather is punishable as part of the underlying crime—the act of reinvesting a criminal operation's net income to promote the carrying on of the operation is still punishable under § 1956(a)(1)(A)(i).

*Santos I*, 461 F.3d at 893. We also noted that *Scialabba* mentioned concealment money laundering only to point out that concealment was not at issue and that the government's case instead rested solely on the disposition of the gross income of unlawful activity and whether that disposition was illegal under Section 1956(a)(1)(A)(i). *Santos I*, 461 F.3d at 893. *Scialabba* mentioned "the lack of concealment simply to show that, to resolve the case,

the court had no alternative but to interpret the word proceeds." *Santos I*, 461 F.3d at 893.

The Supreme Court granted the government's petition for certiorari in *Santos I*, to consider "whether the term 'proceeds' in the federal money-laundering statute, 18 U.S.C. § 1956(a)(1), means 'receipts' or 'profits.'" *Santos II*, 128 S. Ct. at 2022. Although five justices affirmed the judgment in *Santos I*, the case resulted in a fractured opinion. Four justices concluded that proceeds means net profit in Section 1956(a)(1). *Santos II*, 128 S. Ct. at 2025. Four justices concluded that the term proceeds means "the total amount brought in." 128 S. Ct. at 2035 (Alito, J., dissenting). And one justice concluded that the meaning of the term "proceeds" could depend upon the particular underlying predicate offense, any legislative history speaking to the meaning of the term, and whether the merger problem would arise under the particular meaning ascribed to the term. *Santos II*, 128 S. Ct. at 2033 (Stevens, J., concurring). Because in this instance there was no legislative history speaking to the definition of proceeds for the underlying predicate offense of operating a gambling business, and because interpreting proceeds to mean gross receipts under these circumstances would result in the merger problem, Justice Stevens concluded that the rule of lenity would favor the more narrow definition of proceeds as net profits adopted by the plurality. *Id*.

The plurality in *Santos II* acknowledged that Justice Stevens' vote was necessary to the judgment, and noted that the Court's holding was therefore limited to

the narrower ground upon which his opinion rested. *Santos II*, 128 S. Ct. at 2031. The plurality and Justice Stevens then disagreed on the characterization of that narrower ground. The plurality declared:

But the narrowness of his ground consists of finding that "proceeds" means "profits" when there is no legislative history to the contrary. That is all that our judgment holds. It does not hold that the outcome is different when contrary legislative history does exist. Justice STEVENS' speculations on that point address a case that is not before him, are the purest of dicta, and form no part of today's holding. Thus, as far as this particular statute is concerned, counsel remain free to argue Justice STEVENS' view (and to explain why it does not overrule *Clark v. Martinez*, *supra*). They should be warned, however: Not only do the Justices joining this opinion reject that view, but so also (apparently) do the Justices joining the principal dissent. See *post*, at 2036, 2044.

*Santos II*, 128 S. Ct. at 2031. Justice Stevens responded:

In what can only be characterized as the "purest of dicta," the plurality speculates about the *stare decisis* effect of our judgment and interprets my conclusion as resting on the ground that " 'proceeds' means 'profits' when there is no legislative history to the contrary." *Ante*, at 2031. That is not correct; my conclusion rests on my conviction that Congress could not have intended the perverse result that the dissent's rule would produce if its definition of "proceeds" were applied to the operation of an unlicensed

gambling business. In other applications of the statute not involving such a perverse result, I would presume that the legislative history summarized by Justice ALITO reflects the intent of the enacting Congress. See *post*, at 2035 - 2036 and n. 1 (opinion of ALITO, J.). Its decision to leave the term undefined is consistent with my view that "proceeds" need not be given the same definition when applied to each of the numerous specified unlawful activities that produce unclean money. *Clark v. Martinez*, 543 U.S. 371, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005), poses no barrier to this conclusion. In *Martinez* there was no compelling reason—in stark contrast to the situation here—to believe that Congress intended the result for which the Government argued.

*Santos II*, 128 S. Ct. at 2034 n.7.

Each of these cases dealt with the "promotional" prong of the money laundering statute; none addressed the concealment prong, the part that is at issue here. *Compare* 18 U.S.C. § 1956(a)(1)(A)(i) (criminalizing the conducting of financial transactions involving the proceeds of specified unlawful activity *with the intent to promote the carrying on of specified unlawful activity*) with 18 U.S.C. § 1956(a)(1)(B)(i) (criminalizing the conducting of financial transactions involving the proceeds of specified unlawful activity *knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity*). Indeed, the part of the statute at issue here involves not only concealment

but concealment that is carried out across international borders. *See* 18 U.S.C. § 1956(a)(2)(B)(i) (criminalizing transporting, transmitting or transferring funds from a place within the United States to a place outside the United States (or vice versa) knowing that the funds represent the proceeds of some form of unlawful activity, and knowing that the transportation, transmission or transfer is designed in whole or in part to conceal or disguise the nature, the location, the source, the owner-ship, or the control of the proceeds of specified unlawful activity). Nor did any of these cases address money laundering in the context of the predicate crime of wire fraud.

When the predicate crime is wire fraud and the money laundering alleged is the international conceal-ment variety, the merger problem can disappear entirely, and in fact, does disappear from the circumstances pre-sented here. There is no overlap between the wire fraud for which Fechete was convicted and the money laundering scheme that occurred subsequent to the completed wire fraud. To obtain a conviction for wire fraud, the government was required to prove the defen-dant's participation in a scheme to defraud, his intent to defraud, and his use of the wires in furtherance of the fraudulent scheme. *United States v. McGowan*, 590 F.3d 446, 457 (7th Cir. 2009); *United States v. Roberts*, 534 F.3d 560, 569 (7th Cir. 2008), *cert. denied*, 129 S. Ct. 1028 (2009). The wire fraud statute punishes the scheme, not its success. *Pasquantino v. United States*, 544 U.S. 349, 371 (2005). *See also United States v. Coffman*, 94 F.3d 330, 333 (7th Cir. 1996) (the wire fraud statute punishes the

scheme rather than the completed fraud). In *Coffman*, we described wire fraud as a "crime of attempting rather than attaining." 94 F.3d at 337. The fraud is therefore complete once a defendant with the requisite intent has used the wires in furtherance of a scheme to defraud, whether or not the defendant actually collects any money or property from the victim of the scheme. *United States v. Lorefice*, 192 F.3d 647, 655-56 (7th Cir. 1999) (wire fraud may be complete even where the fraudulent scheme was interrupted before any concrete harm had been inflicted); *Coffman*, 94 F.3d at 337 (even if the fraud inflicted no actual loss, it may nevertheless be a completed offense); *United States v. Strozier*, 981 F.2d 281, 285 (7th Cir. 1992) (a fraud is not incomplete merely because circumstances prevented the defendant from inflicting greater loss upon the victim). In this case, the crime of wire fraud was complete no later than when the victims wired their money to the defendants via Western Union. By that point, Fechete had entered into a plan with the Foreign Co-schemers to engage in internet fraud. He had supplied to the Foreign Co-schemers, via text message and email, false names to use to lure victims, and the victims, having taken the bait, had wired their money via Western Union to the waiting Fechete. Even if Fechete had been arrested walking into the currency exchange, he would have been guilty of wire fraud by that time, even if the victims had not been deprived of their funds.

The money laundering, on the other hand, did not occur until Fechete collected the wired proceeds, converted those funds to cash, took his own cut of the pro-

ceeds, paid any co-schemers who had participated in collecting the wired funds, and then wired the remaining funds to the Foreign Co-schemers in Romania, again using false identities and multiple parties in order to conceal the source, the ownership and the control of those funds. Although this action aided the Foreign Co-Schemers and ensured that the Foreign Co-schemers would send Fechete repeat business, none of this part of the scheme was necessary to the proof of the wire fraud. It formed an entirely separate offense of money laundering. In a sense, sending some of the money to Romania was the second chapter of the internet fraud story. But each chapter stood alone as a crime. The only connection, as required by the money laundering statute, was that the money which was laundered was the product of specified unlawful activity, in this case wire fraud.

Fechete argues that the money he sent to Romania was not "proceeds" of wire fraud as that term has been defined in *Santos II* and *Scialabba.* Fechete contends that only net profits count as proceeds under *Santos II*. Because the government concedes it did not prove how the money was used in Romania, Fechete argues that it would be speculative to characterize that money as net profits. There may have been more expenses to be covered on the Romanian side of the scam, and there is no way to know how much of the money that went to Romania was net profit and how much covered additional expenses. Although we can only speculate on the disposition of the money in Romania, we know that the amount sent to Romania was not strictly gross receipts

because Fechete had already subtracted his own cut and any payments he made to co-schemers in the United States. If *Santos II* requires that proceeds of wire fraud in the context of concealment money laundering means pure profit, then there was error in allowing the jury to assume otherwise.

We have had few occasions to interpret the Supreme Court's opinion in *Santos II*. *See United States v. Lee*, 558 F.3d 638 (7th Cir. 2009); *United States v. Hodge*, 558 F.3d 630 (7th Cir. 2009). In *Hodge*, the defendants were convicted of conspiring to operate a racketeering enterprise through interstate facilities in violation of 18 U.S.C. §§ 371 and 1952(a)(3). This is a fancy way of saying that they ran a brothel and accepted credit card payments that were processed through interstate wires. They also were convicted of conspiring to engage in money laundering in violation of § 1956(a)(1)(A) and (h). The government's theory was that they violated § 1956 by paying the business expenses of the brothel, such as rent, advertising, utilities, and so on. *Hodge*, 558 F.3d at 632. We noted that *Scialabba* and *Santos I* held that "proceeds" means an illegal business' net income rather than its gross income. We rejected the government's claim that, under these cases, the amount that remained after the prostitutes were paid represented net profits. We held that "[t]o determine the net proceeds of a transaction, which is to say the profits, one must subtract *all* costs of doing business, not just an arbitrary subset of the costs." *Hodge*, 558 F.3d at 632 (emphasis in original). We characterized *Scialabba* as holding "that paying the ordinary and necessary expenses of a business is not a

federal crime, just because that business violates state laws." *Hodge*, 558 F.3d at 632. But answering the question of what constituted net profits under *Scialabba* did not address the "real question [of] whether *Scialabba* survived the Supreme Court's decision in *Santos* [*II*]." We commented:

> Four Justices in *Santos* [*II*] concluded that "proceeds" in § 1956 always means net income. Four concluded that the word always means gross income. Justice Stevens concluded that the meaning depends on the nature of the crime—that it means net income for unlicensed gambling (the subject of *Santos* [*II*] and *Scialabba*) but could mean gross income for drug rings. We asked the parties to file supplemental briefs addressing the question how *Santos* [*II*] applies to a brothel (operated in a place where prostitution is unlawful) that lets the patrons pay by credit card. The United States has conceded that the net-income approach of *Scialabba* remains controlling.

> Whether the concession was appropriate is a difficult question, which we need not answer since the prosecutor has forfeited any benefit that Justice Stevens's approach may offer.

*Hodge*, 558 F.3d at 633-34. The main import of this passage is that whether *Scialabba* survives *Santos II* is an open and "difficult" question. With the law unsettled, the error cannot be plain. *United States v. Gibson*, 530 F.3d 606, 612 (7th Cir. 2008) (where there is an unsettled question, the error is not plain and does not fall with Rule 52).

Taking a single sentence out of context, Fechete
contends that our opinion in *Lee* held that *Scialabba*
was not limited to the promotional prong of the money
laundering statute. In *Lee*, we again addressed convic-
tions for racketeering arising from running brothels
and accepting credit card payments, as well as money
laundering convictions arising from paying the expenses
of running a prostitution business, including rent, ad-
vertising, phone bills and wages. *Lee*, 558 F.3d at 640.
In recounting our analysis in *Santos I* and *Scialabba*,
we stated that, in *Santos I*:

> We did clarify and confirm that the statute does in-
> deed prohibit both concealment of net proceeds and
> the reinvestment of net proceeds to promote the
> illicit activity; *Scialabba* had not suggested otherwise.

*Lee*, 558 F.3d at 642 (citing *Santos I*, 461 F.3d at 892-93).
Fechete stakes his claim that we did not limit *Scialabba*'s
net profits analysis to promotional money laundering
on this single sentence from *Lee*. But *Lee* was merely
repeating a narrower point we had made in *Santos I*. In
*Santos I*, the government argued that *Scialabba* had eviscer-
ated the promotional prong of the money laundering
statute and limited the crime of money laundering to
concealment situations only. In response, we clarified:

> This is a misreading of *Scialabba*. 282 F.3d at 476. To
> be sure, the statute criminalizes the concealment of
> proceeds and also prohibits the use of proceeds to
> promote the illicit activity.

*Santos I*, 461 F.3d at 892-93. Although in *Lee* we used the
term "net proceeds" instead of "proceeds" when we

were recounting our reasoning in *Santos I*, the point was that *Scialabba* had not eviscerated the promotional prong of the money laundering statute. The meaning of "proceeds" in the concealment context was not at issue in *Lee* and this difference in phrasing does not have the force of a holding. We have not addressed the meaning of "proceeds" in the concealment context. The law remains unsettled and the error is therefore not plain.

Post-*Santos II* decisions from other circuits fortify our conclusion that any error (if there was error) was not plain. In *United States v. Fernandez*, 559 F.3d 303 (5th Cir. 2009), the Fifth Circuit considered a sufficiency of the evidence challenge to a conviction for concealment money laundering. Several defendants in the case were charged with drug trafficking offenses, but Fernandez was charged only with money laundering. Fernandez engaged in several highly complex real estate transactions, taking money derived from the drug trafficking offenses, channeling it through shell corporations and real estate transactions and then returning it to the drug traffickers. Fernandez was charged with both conspiracy and substantive money laundering under § 1956(a)(1)(B)(i). The jury was instructed that "'proceeds' includes any property, or any interest in property, that someone acquires or retains as a result of the commission of the underlying specified unlawful activity." 559 F.3d at 315-16. Although he did not object to this instruction at trial, Fernandez brought a claim for plain error on appeal based on the Supreme Court's intervening opinion in *Santos II*. After noting that Justice Stevens did not agree with the plurality that the rule of

lenity must apply to the definition of proceeds when the underlying criminal activity involved the sale of contraband and the operation of organized crime syndi-cates, the court concluded, "While Justice Stevens and the plurality disagreed over the precise precedential effect of his statement, the uncertainty renders any error here not 'plain'." 559 F.3d at 316.

The Eleventh Circuit also considered a plain error challenge to a conviction for money laundering under § 1956(a)(3)(A),(B). *United States v. Demarest*, 570 F.3d 1232 (11th Cir. 2009). That part of the money laundering statute addresses financial transactions conducted with "property represented to be the proceeds of specified unlawful activity," where the representations come from undercover law enforcement officers or persons cooperating with law enforcement officers. In this instance, undercover law enforcement officers arranged to purchase a boat from Demarest with cash that they told him came from the sale of cocaine. On appeal, Demarest challenged his conviction under *Santos II* on the ground that the agents represented to him that the money involved in the purchase was gross receipts of drug trafficking rather than net profit. 570 F.3d at 1241. The Eleventh Circuit noted that *Santos II* has limited precedential value because of the split nature of the decision. The court commented that the "narrow holding in *Santos* [*II*], at most, was that the gross receipts of an unlicensed gambling operation were not 'proceeds' under section 1956." 570 F.3d at 1242. Because the laundered funds in Demarest's conviction came from drug traf-

ficking rather than a gambling enterprise, the Eleventh Circuit found that *Santos II* did not apply.

We reach a similar conclusion here. If there was error, it was not plain. First, *Santos II* and *Scialabba* did not resolve the meaning of the word "proceeds" for *concealment* money laundering. Each case limited its holding to Section 1956(a)(1) and Fechete was charged under Section 1956(a)(2)(B)(i). True, the *Santos II* plurality held the view that the meaning of the word "proceeds" "cannot change with the statute's application." 128 S. Ct. at 2030. And the four justices joining the dissent agreed that the meaning of the term "proceeds" does not change depending on the nature of the predicate illegal activity. 128 S. Ct. at 2035-36 (Alito, J., dissenting). But the dissent held the view that proceeds always means gross receipts, and approved Justice Stevens' approach to the extent that it "preserves the correct interpretation of the statute in most of the cases that were the focus of Congressional concern when the money laundering statute was enacted." 128 S. Ct. at 2036 (Alito, J., dissenting). There seems little doubt that the four justices of the dissent and Justice Stevens (who, of course, is no longer an active member of the Court)[11] would have little trouble upholding Fechete's conviction for concealing money that was mostly (or perhaps entirely) profit from a wire fraud operation. That the government could not prove what part of the money sent to Romania was

---

[11] Justice Souter, who was part of the majority in *Santos II*, is also no longer an active member of the Court.

profit likely would not move the dissenting or con-
curring justices in a concealment case; otherwise, the
more successfully criminals were able to commit the
crime of concealment, the less chance the government
would have of prosecuting the case to conviction. It seems
unlikely that Congress intended to require proof of
how funds transmitted to another country were then
spent when the point of Section 1956(a)(2)(B)(i) is to
criminalize transactions designed to make it difficult to
track or recover illegally obtained money. Indeed, Con-
gress amended the statute following *Santos II* to define
"proceeds" as "any property derived from or obtained
or retained, directly or indirectly, through some form of
unlawful activity, including the gross receipts of such
activity." 18 U.S.C. § 1956(c)(9).

Second, as we discussed above, there is no merger
problem presented here because the wire fraud was
complete without the additional transmission of the
money to Romania. There is no factual or legal overlap
between the crimes of wire fraud and concealment
money laundering as charged here. Had the govern-
ment charged as money laundering the victims' trans-
mission of funds to currency exchanges via Western
Union, the so-called merger problem may have
presented itself. But the government charged Fechete
with a *second* transmission of those funds, after most
expenses had been extracted, not for the purpose of
carrying on the scheme but for the purpose of hiding
the profits.

Third, unlike a brothel or an illegal gambling opera-
tion (which we characterized in *Scialabba* as a "voluntary,

business-like operation"), the scheme here was an un-business-like operation of pure thievery. The scheme was not to sell inferior goods or counterfeit goods or even stolen goods using the internet. There were no goods at all; the entire point of the scheme was to induce people to part with their money in return for nothing. This was not a "voluntary business" having any true overhead expenses. It was simple theft. The rule of lenity would not help Fechete here because any thief would understand that he could not deduct the cost, for example, of his mask and gun from the loot in calculating the "proceeds" of the crime for which he would be held accountable. So too with this scheme, all of the victims' money could be characterized as "profit," although we need not go that far. Under the facts alleged in the indictment, the only funds at issue in the money laundering count were those sent to Romania after the expenses of paying off the U.S. Co-schemers had been deducted. No one would be caught by surprise to discover that this amount would be considered "proceeds" for the purposes of the concealment prong of the money laundering statute. *See Scialabba*, 282 F.3d at 477 (finding that the rule of lenity counsels against transmuting "proceeds" into "receipts" and "catching people by surprise in the process").

We need not predict how the Court would ultimately rule, though, because the doubt alone is enough to render any error not plain; it was neither clear nor obvious. *Olano*, 507 U.S. at 734 (an error is plain if it is clear or obvious). The fractured Supreme Court opinion addressed only promotional and not concealment money

laundering (much less international concealment money laundering). And even in the context of promotional money laundering, it is not clear how the Court as a whole would rule if the predicate crime was wire fraud that was complete before the money laundering began.

We emphasize that we are not today answering the question of whether "proceeds" means net profits or gross receipts when the predicate offense is wire fraud and the money laundering involves concealment rather than promotion. We reserve that issue for a case where it is squarely presented. Our only holding today is that the district court did not commit plain error when it did not limit the jury's consideration of "proceeds" to the net profits of the internet fraud scheme in a case brought under § 1956(a)(2)(B)(i). Fechete's conviction for money laundering will stand.

**2.**

Fechete was also charged with aggravated identity theft in violation of 18 U.S.C. § 1028(a)(1). That statute "imposes a mandatory consecutive 2-year prison term upon individuals convicted of certain other crimes if, during (or in relation to) the commission of those other crimes, the offender ' knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person.'" *Flores-Figueroa v. United States*, 129 S. Ct. 1886, 1888 (2009). Fechete was charged with possessing a Canadian passport in conjunction with wire fraud. The government took the position at trial that it was not required to prove that Fechete knew the

passport belonged to an actual person as opposed to a fictitious one. In fact, the government conceded that it could not prove that Fechete had this knowledge. The district court agreed with the government that this proof was not necessary to sustain a conviction for aggravated identity theft. After his conviction, Fechete moved for a judgment of acquittal on the aggravated identity theft charge on the grounds that the government failed to prove that he knew the passport belonged to a real person. The district court denied that motion.

Subsequent to Fechete's trial, the Supreme Court ruled that the statute requires the government to show that the defendant knew that the "means of identification" he or she unlawfully transferred, possessed, or used, in fact, belonged to "another person." *Flores-Figueroa*, 129 S. Ct. at 1888. In other words, the statute requires that the defendant know the document belonged to a real person and was not simply a purely fictitious creation not tied to any person. As it did below, the government concedes on appeal that the evidence presented at trial was insufficient to prove that Fechete knew the passport belonged to another person as opposed to being a purely fictitious document. We agree that the case against Fechete was insufficient under the standard set in *Flores-Figueroa*. We therefore vacate Fechete's conviction for aggravated identity theft.

### 3.

Fechete also raises two challenges to his sentence. He claims first that the court erred in finding that he

possessed a gun in connection with the wire fraud offenses. Second, he contends that the court erred in attributing to him losses of more than $1,000,000 to more than 250 victims.

We begin with the gun. The court applied a two-level enhancement to Fechete's sentence under Section 2B1.1(b)(13)(B) for possession of a dangerous weapon (including a firearm) "in connection with" a fraud offense.[12] Fechete does not dispute that he possessed a gun. Law enforcement officers recovered a loaded Glock 9mm semi-automatic pistol from a hole under a false bottom of a cabinet in Fechete's apartment. The same compartment contained false identification documents for Fechete and others, and passport photographs of some of Fechete's co-schemers. Schneider told law enforcement officers that when he complained to Fechete that he had been injured by a friend in a fight, Fechete pulled out a pistol, inserted the magazine, and bragged that he would shoot the person who hurt Schneider. Schneider also saw Fechete wave the gun around while performing a "Tony Montana" imitation for friends at

---

[12] Fechete was sentenced under the 2007 version of the guidelines. In that version, this enhancement was contained in subsection (b)(12)(B) of Section 2B1.1. Although it was subsequently renumbered to subsection (b)(13)(B), the relevant language remained the same and we will use the new numbering system.

his apartment.[13] This is the entirety of the government's evidence that the gun was possessed "in connection with" the wire fraud offenses.

The government contends that the gun's proximity to false identification documents provides evidence that the gun was possessed in connection with the wire fraud offenses. The government relies on cases where we held that guns found in close proximity to illegal drugs are presumptively considered to have been used in connection with the drug offense. *See United States v. Booker*, 248 F.3d 683, 689 (7th Cir. 2001). Although we have repeatedly held that guns are well-known tools of the drug trade, there is no corresponding case law supporting the idea that guns are well-known tools of the wire fraud trade. *See United States v. Are*, 590 F.3d 499, 527-28 (7th Cir. 2009), *cert. denied*, 131 S. Ct. 73 (2010) (noting that we have consistently held that guns are recognized tools of the drug trade, and that the possession of a gun can advance the possession and future distribution of narcotics by protecting the drugs or the drug dealer). Wire fraud conducted over the internet is not typically a con-

---

[13] "Tony Montana" is the main character in the 1983 movie "Scarface." Portrayed by Al Pacino, Montana is a violent drug lord and hit man. Roger Ebert describes the character as a Cuban ex-con who "begins with no resources or weapons except for his bravado, and fakes out more powerful men simply by *seeming* dangerous and resourceful." *See* http://rogerebert.suntimes.com/apps/pbcs.dll/article?AID= /20030928/REVIEWS08/309280301/1023 (last visited May 9, 2011).

frontational crime and does not involve the same sorts of risks that are inherent in the drug trade. That the gun was found with false identification documents does not tell us anything more than Fechete placed together objects he wished to hide. Fechete's claim that he would use the gun to protect Schneider was entirely unrelated to the internet fraud scheme and thus does not add to the evidence that the gun was used "in connection with" the fraud. As for brandishing the gun in imitation of a movie character, this conduct again was entirely unrelated to the fraud scheme. The government did not present any evidence that Fechete carried the gun to currency exchanges or used it in the scheme at all. There is simply not enough evidence to tie the gun to the scheme. When Fechete is resentenced, the district court may not apply the Section 2B1.1(b)(13) enhancement for possession of a dangerous weapon in connection with a fraud offense.

We turn finally to Fechete's claim that the court failed to make appropriate findings regarding the scope of jointly undertaken criminal activity and the foreseeability of losses totaling more than $1,000,000 to more than 250 victims. After we issued our decision in *United States v. Salem*, 597 F.3d 877 (7th Cir. 2010), the government conceded that the district court failed to make appropriate findings regarding the scope of jointly undertaken criminal activity. Our review of the record confirms the government's concession. On remand, the district court should apply the approach we set forth in *Salem* for Section 1B1.3(a)(1)(B) enhancements. The court must first make a preliminary determination of the

scope of the criminal activity the defendant agreed to jointly undertake. *Salem*, 597 F.3d at 886. "Then the court must make a two-part determination of whether the conduct of others was both in furtherance of that joint criminal activity and reasonably foreseeable to the defendant in connection with the joint criminal activity." *Salem*, 597 F.3d at 886.

The government asks us to limit the remand to the question of the scope of jointly undertaken criminal activity. Fechete wishes additionally to contest the reliability of the government's spreadsheets which the court used to calculate the losses to victims and the number of victims. He also challenges the court's finding that the conduct of Moloman and Salem was reasonably foreseeable to him. Finally, he notes that the court erred in adding together the numbers of victims and amount of losses for Fechete himself, Schneider and Vega. We do not interpret his complaint about foreseeability findings as applying to the court's finding that losses to the victims of Schneider and Vega were reasonably foreseeable to him. Such a challenge would fail in any case because a finding of foreseeability is not required under Section 1B1.3(a)(1)(A), which holds a defendant liable for "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant[.]" The trial presented more than adequate evidence that Fechete recruited Schneider and Vega and directed their activities in the scheme.

The government is correct that Fechete did not object to the use or accuracy of the government's spreadsheets

even though he was given an opportunity to do so. Moreover, Fechete himself relied on the spreadsheets in presenting the court with alternative calculations of losses. By affirmatively relying on those documents himself, Fechete has waived any objections to the reliability of the spreadsheets and there is no reason to re-litigate that issue on remand. *Salem*, 597 F.3d at 890 (waiver is the intentional relinquishment of a known right which precludes appellate review).

Finally, we find no error in the district court's findings that Fechete reasonably foresaw the conduct of Moloman and Salem. The evidence supporting this finding included (1) Panaitescu's testimony that he, Moloman and Fechete shared rides to currency exchanges; (2) records from Western Union and currency exchanges showing that Fechete frequented the same currency exchanges as Moloman and Salem; (3) documents seized from Fechete's apartment including mail for Moloman and documents in the name of an alias used by Salem; and (4) use of the same telephone numbers and addresses by Salem and Fechete when collecting money from Western Union agents at currency exchanges. Because the court did not make adequate findings, however, regarding the scope of jointly undertaken criminal activity, the correct amount of foreseeable losses and victims remains to be determined on remand. We trust that the district court will also correct on remand the mathematical errors that appear to have been made when calculating losses attributable to Fechete for Schneider and Vega.

## II.

In sum, we grant the motion of Aslan's attorney to withdraw and we dismiss Aslan's appeal. We dismiss Panaitescu's appeal as well, because the appeal waiver contained in his plea agreement precludes review of any of the issues he now raises. We affirm Dumitru's sentence. We vacate Fechete's conviction for aggravated identity theft, affirm his conviction for money laundering, and vacate and remand his sentence for further proceedings consistent with this opinion.